UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

In re:

**NORANDA ALUMINUM, INC.,** *et al.,*

Debtors.

**Case No. 16-10083-399**

**Chapter 11**

**Jointly Administered**

**Hearing Date & Time**:
March 8, 2016 at 2:00 p.m.
(prevailing Central Time)

**Hearing Location**:
St. Louis Courtroom 5 North

**NOTICE OF DEBTORS' APPLICATION FOR AUTHORITY TO RETAIN
AND EMPLOY PJT PARTNERS LP AS INVESTMENT BANKER
TO THE DEBTORS AND DEBTORS-IN-POSSESSION**

PLEASE TAKE NOTICE that this application is scheduled for hearing on **March 8, 2016 at 2:00 p.m. (prevailing Central Time)**, before the Honorable Barry S. Schermer in Bankruptcy Courtroom 5 North, in the Thomas F. Eagleton U.S. Courthouse, 111 South Tenth Street, St. Louis, Missouri 63102.

WARNING: Any response or objection to this application must be filed with this court by **March 1, 2016**.  A copy shall be promptly served upon the undersigned.  Failure to file a timely response may result in the Court granting the relief requested prior to the hearing date.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just and proper.

Dated:  February 17, 2016
        St. Louis, Missouri

Respectfully submitted,

CARMODY MACDONALD P.C.

*/s/ Christopher J. Lawhorn*
Christopher J. Lawhorn, #45713MO
Angela L. Drumm, #57678MO
Colin M. Luoma, #65000MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri  63105
Telephone:  (314) 854-8600
Facsimile: (314) 854-8660
cjl@carmodymacdonald.com
ald@carmodymacdonald.com
cml@carmodymacdonald.com

*Proposed Local Counsel to the Debtors and Debtors in Possession*

- and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Alan W. Kornberg
Elizabeth McColm
Alexander Woolverton
Michael M. Turkel
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
akornberg@paulweiss.com
emccolm@paulweiss.com
awoolverton@paulweiss.com
mturkel@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

|  |  |
|---|---|
| **In re:**<br><br>**NORANDA ALUMINUM, INC.,** *et al.*,<br><br>           Debtors. | **Case No. 16-10083-399**<br><br>**Chapter 11**<br><br>**Jointly Administered**<br><br>**Hearing Date & Time**:<br>March 8, 2016 at 2:00 p.m.<br>(prevailing Central Time)<br><br>**Hearing Location**:<br>St. Louis Courtroom 5 North |

**DEBTORS' APPLICATION FOR AUTHORITY TO RETAIN
AND EMPLOY PJT PARTNERS LP AS INVESTMENT BANKER
<u>TO THE DEBTORS AND DEBTORS-IN-POSSESSION</u>**

Noranda Aluminum, Inc. and its affiliated debtors and debtors-in-possession in the above-captioned cases (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>" and, together with their non-Debtor subsidiary, the "<u>Company</u>") move for entry of an order pursuant to sections 327(a) and 328(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rules 2014-1 and 2016-1 of the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court for the Eastern District of Missouri (the "<u>Local Rules</u>"), authorizing the retention and employment of PJT Partners LP ("<u>PJT Partners</u>" or the "<u>Advisor</u>") as investment banker to the Debtors in these chapter 11 cases.  In support of this application (the "<u>Application</u>"), the Debtors rely upon (a) the Declaration of James H. Baird (the "<u>Baird Declaration</u>"), attached hereto as <u>Exhibit A</u> and (b) the Declaration of Annah Kim-Rosen (the "<u>Kim-Rosen Declaration</u>"), attached thereto as <u>Exhibit B</u>, and respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The predicates for the relief requested herein are sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016 and Local Rules 2014-1 and 2016-1.

## BACKGROUND

3.      On February 8, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code thereby commencing the instant cases (the "Chapter 11 Cases").  The Debtors continue to manage and operate their businesses as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

4.      The Debtors' cases are being jointly administered pursuant to the *Order Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015 Directing Joint Administration* entered by this Court on February 9, 2016 in each of the Debtors' cases.

5.      No trustee, examiner or official committee has been appointed in these Chapter 11 Cases.

6.      Information regarding the Debtors' businesses, their capital and debt structure, and the events leading to the filing of the Chapter 11 Cases is contained in the *Declaration of Dale W. Boyles in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration").[1]

---

[1]      The First Day Declaration was filed on the Petition Date and is incorporated herein by reference.

2

## RELIEF REQUESTED

7.     By this Application, the Debtors request entry of an order (the "Proposed Order")[2]: (i) authorizing the Debtors to retain and employ PJT Partners as their investment banker under the terms and conditions set forth in that certain engagement letter dated November 6, 2015, as amended and restated on January 25, 2016 (the "Engagement Letter"), which amended and restated letter is attached to this Application as Exhibit C and is incorporated herein by reference; (ii) approving the terms of the Advisor's employment, including the proposed fee structure and indemnification provisions set forth in the Engagement Letter, subject to the standards set forth in section 328 of the Bankruptcy Code; provided that the proposed fee structure and indemnification provisions set forth in the Engagement Letter shall not be subject to the standard of review set forth in section 330 of the Bankruptcy Code, except solely by the Office of the U.S. Trustee for the Eastern District of Missouri (the "U.S. Trustee"), who, for the avoidance of doubt, shall be entitled to review applications for payment of compensation and reimbursement of expenses of the Advisor under section 330 of the Bankruptcy Code; and (iii) granting such other and further relief as the Court deems appropriate.

## BASIS FOR RELIEF REQUESTED

8.     The Advisor is well qualified to serve as the Debtors' investment banker.  As detailed in the Baird Declaration, PJT Partners is part of a leading independent financial advisory firm, listed on the New York Stock Exchange (ticker symbol: PJT).  The Advisor's restructuring and reorganization advisory operation is one of the world's leading advisory services providers to companies and creditors in restructurings and bankruptcies.  PJT Partners is a wholly owned subsidiary of PJT Partners Holdings LP, of which PJT Partners, Inc. acts as sole general partner.

---

[2]     A copy of the Proposed Order will be made available on the Debtors' case information website at *https://cases.primeclerk.com/noranda.*

PJT Partners Inc. was formed in part through a multi-step merger and spin off transaction whereby Blackstone Advisory Partners L.P.'s ("Blackstone") restructuring and advisory groups were spun-off to form PJT Partners and its affiliated operating entities. The PJT Partners restructuring professionals (also in their former capacity as Blackstone employees) have been conducting business and providing to their clients the same high quality restructuring services that Blackstone had itself provided since the formation of its restructuring advisory practice in 1991.

9.    PJT Partners' restructuring group has approximately 60 employees globally.  The members and senior executives of the Advisor's restructuring and reorganization practice (whether as employees of PJT Partners or Blackstone) have assisted and advised numerous chapter 11 debtors in the development of plans of reorganization and are experienced in analyzing restructuring and related chapter 11 issues. The members and senior executives of the Advisor's restructuring and reorganization practice (also in their former capacity as Blackstone employees) have been particularly active in large, complex and high-profile bankruptcies and restructurings, having advised in the following matters, among others, in their chapter 11 reorganizations:  AbitibiBowater Inc.; Adelphia Communications Corporation; Ambac Financial Group, Inc.; Apex Silver Mines Ltd.; Arch Coal, Inc.; Caesars Entertainment Operating Corporation; Cengage Learning, Inc.; Delta Air Lines, Inc.; Dynegy Inc.; Eastman Kodak Company; Edison Mission Energy; Energy Future Holdings Corporation; Enron Corporation; Excel Maritime Carriers, Ltd.; Flag Telecom Holdings Limited; Flying J. Inc.; Genco Shipping & Trading Limited; General Motors Corporation; Global Crossing Ltd.; Houghton Mifflin Harcourt Publishing Company; Lee Enterprises Inc.; LightSquared Inc.; Los Angeles Dodgers LLC; LyondellBasell Industries; Mirant Corp.; NewPage Corporation; NTK Holdings, Inc.;

Patriot Coal Corporation; SemGroup; TerreStar Networks Inc.; Tribune Company; Walter Energy, Inc.; W.R. Grace & Co.; and Winn-Dixie Stores, Inc. In addition, the restructuring group has provided general restructuring advice to such major companies as Clearwire Corporation, Ford Motor Company, The Goodyear Tire & Rubber Company and Xerox Corporation.

10.  The members and senior executives of the Advisor's financial advisory practice (whether as employees of PJT Partners or Blackstone) have assisted and advised numerous clients conducting mergers and acquisitions in chapter 11 proceedings and in the metals and mining sector, having advised in the following transactions, among others: Peabody's acquisition of Macarthur Coal, Joy Global's acquisition of IMM, the sale of Alcan to Rio Tinto, the pending sale of Walter Energy's core mining assets to its lender group and the sale of Walter Energy's non-core mining assets and Coke business to ERP Compliant Fuels.

11.  Since its engagement in November 2015, the Advisor has advised the Debtors in connection with their efforts to raise capital and explore restructuring alternatives. During this time, the Advisor has become intimately familiar with the Debtors' businesses, affairs, assets and contractual arrangements. The Advisor has worked closely with the Debtors to analyze the Debtors' financial positions and to assist the Debtors in evaluating various restructuring options. Accordingly, the Advisor has the necessary background to deal effectively and efficiently with many financial issues and problems that may arise in the context of the Debtors' Chapter 11 Cases.

12.  As a result of the prepetition work performed on behalf of the Debtors, the Advisor has acquired significant knowledge of the Debtors' financial affairs, debt structure, business operations, capital structure, key stakeholders, financing documents and other related

5

material information.  Likewise, in providing prepetition services to the Debtors, the Advisor's professionals have worked closely with the Debtors' management, board of directors and other advisors.  If this Application is approved, several of the Advisor's professionals, all with substantial expertise in the areas discussed above, will continue to provide services to the Debtors.  Such personnel, including Partners Steven Zelin, Mark Buschmann and James Baird, will lead the team of the Advisor's professionals and will work closely with the Debtors' management and other professionals throughout the reorganization process.  Accordingly, as a result of the Advisor's representation of the Debtors prior to the commencement of these Chapter 11 Cases and the Advisor's extensive experience in representing chapter 11 debtors, the Advisor is well qualified to provide these services and represent the Debtors during their Chapter 11 Cases.

## THE ADVISOR'S DISINTERESTEDNESS

13.     To the best of the Debtors' knowledge, and except as set forth in the Kim-Rosen Declaration: (i) the Advisor has no relevant connection with any of the Debtors, the Debtors' creditors, any person employed in the office of the U.S. Trustee or any other party with an actual or potential interest in these Chapter 11 Cases (or their respective attorneys or accountants); (ii) the Advisor (and the Advisor's professionals) are not creditors, equity security holders or insiders of any of the Debtors; (iii) neither the Advisor nor any of its professionals is or was, within two years of the Petition Date, a director, officer or employee of any of the Debtors; and (iv) neither the Advisor nor any of its professionals hold or represent an interest materially adverse to any of the Debtors, their estates or any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with or interest in any of the Debtors, or for any other reason.  Accordingly, based upon its review of interested parties in these Chapter

11 Cases, the Advisor is a "disinterested person" as defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and the Advisor's employment is permissible under sections 327(a) and 328(a) of the Bankruptcy Code.

14.    The Debtors' knowledge, information and belief regarding the matters set forth herein are based upon, and made in reliance on, the Kim-Rosen Declaration.  The Advisor will continue to monitor for any matters that might affect its disinterested status.  To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of the Advisor's retention are discovered or arise, the Advisor will use reasonable efforts to promptly file a supplemental declaration.

15.    Before the Petition Date, the Debtors paid the Advisor $713,926.88 in fees and expenses.  The aforementioned amount includes an estimate of out-of-pocket prepetition expenses incurred by the Advisor.  The Debtors also paid the Advisor a $25,000 expense advance.[3]

## SERVICES TO BE RENDERED[4]

16.    Subject to further order of this Court, and in accordance with the terms of the Engagement Letter, the Debtors request the retention and employment of the Advisor to render certain of the following investment banking services to the Debtors as necessary, appropriate, feasible, and as may be requested by the Debtors:

      (a)    assist in evaluating of the Debtors' businesses and prospects;

      (b)    assist in developing a long-term business plan and related financial projections for the Debtors and their subsidiaries;

---

[3]    Upon conclusion of the Advisor's employment, any portion of the expense advance not applied to actual expenses incurred shall, at the Debtors' option, either be returned to the Debtors or applied to PJT Partners' postpetition fees and expenses approved by the Court.

[4]    The following is a summary and is qualified in its entirety by the descriptions in the Engagement Letter. Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Engagement Letter.

(c)     assist in the development of financial data and presentations to the Debtors' Board of Directors, various creditors and other third parties;

(d)     analyze the financial liquidity of the Debtors and evaluate alternatives to improve such liquidity;

(e)     analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of those stakeholders impacted by the Restructuring;

(f)     provide strategic advice with regard to restructuring or refinancing the Debtors' Obligations;

(g)     evaluate the Debtors' debt capacity and alternative capital structures;

(h)     participate in negotiations with creditors, suppliers, lessors, employee representatives and other interested parties;

(i)     value securities offered in connection with a restructuring of the Debtors;

(j)     advise the Debtors and negotiate with lenders with respect to potential waivers or amendments of various credit facilities;

(k)     assist in arranging financing for the Debtors, as requested;

(l)     provide expert witness testimony relating to any of the subjects encompassed by the other investment banking services;

(m)     assist the Debtors in preparing marketing materials in conjunction with a possible Sale Transaction;

(n)     assist the Debtors in identifying potential buyers or parties in interest to a Sale Transaction and assist in the due diligence process;

(o)     assist and advise the Debtors concerning the terms, conditions and impact of any proposed Sale Transaction; and

(p)     provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring or Sale Transaction, as requested and mutually agreed.

17.     The services that the Advisor will provide to the Debtors are necessary to enable the Debtors to maximize the value of their estates.  The Debtors believe that the services will not duplicate the services that other professionals will be providing to the Debtors in these Chapter 11 Cases.  Specifically, the Advisor will carry out unique functions and will use reasonable

8

efforts to coordinate with the Debtors' other retained professionals to avoid unnecessary duplication of services.

## PROFESSIONAL COMPENSATION

18.    In consideration of the services to be provided by the Advisor, and as more fully described in the Engagement Letter, subject to this Court's approval, the Debtors and the Advisor have agreed that the Advisor shall, in respect of its services, be paid in cash under the following fee structure (the "Fee Structure"):

(a)    Monthly Fee.  During the term of the Engagement Letter, the Debtors shall pay the Advisor a monthly advisory fee equal to $175,000 per month, payable in advance in cash, with the first Monthly Fee payable upon execution of the original Engagement Letter and additional installments of such Monthly Fee payable in advance on each subsequent monthly anniversary of the Effective Date;

(b)    Restructuring Fee.  The Debtors shall pay the Advisor an additional fee (the "Restructuring Fee") equal to $5,000,000 payable upon the closing of a Restructuring.[5]  The Debtors and PJT Partners acknowledge and agree that:  (I) to the extent paid, any Restructuring Fee payable to PJT Partners shall be reduced by any Sale Transaction Fees previously paid to PJT Partners and (II) in no circumstances shall the total amount of Sale Transaction Fee(s) and Restructuring Fee payable to PJT Partners (excluding expenses) exceed $5,000,000.

(c)    Sale Transaction Fees.  The Debtors shall pay the Advisor upon the consummation of a Sale Transaction, a sale transaction fee (the "Sale Transaction Fee") payable in cash directly out of the gross proceeds of the Sale Transaction or other available funds calculated as 1.25% of the Consideration.[6]  The Debtors and PJT Partners acknowledge and agree

---

[5]    For purposes of the Engagement Letter, a Restructuring shall be deemed to have been consummated upon the earlier of (a) the execution, confirmation and consummation of a plan of reorganization pursuant to an order of the Bankruptcy Court or (b) the transfer of the Company's assets remaining after consummating at least one Sale Transaction into a liquidating trust or similar vehicle through which the Company's remaining assets are to be sold or liquidated pursuant to a Bankruptcy Court order approving same.

[6]    For purposes of the Engagement Letter, "Consideration" means the gross value of all cash, securities and other properties paid or payable, directly or indirectly, in one transaction or in a series or combination of transactions, in connection with the Sale Transaction or a transaction related thereto (including, without limitation, amounts paid (A) pursuant to covenants not to compete or similar arrangements and (B) to holders of any warrants, stock purchase rights, convertible securities or similar rights and to holders of any options or stock appreciation rights, whether or not vested). Consideration shall also include (i) (I) in the case of the sale, exchange or purchase of the Company's equity securities the principal amount of any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities as set forth on

9

that:  (i) PJT Partners shall be paid a Sale Transaction Fee with respect to each Sale Transaction consummated by the Debtors, (ii) to the extent paid, all Sale Transaction Fees shall be credited against any Restructuring Fee payable to PJT Partners and (iii) in no circumstances shall the total amount of the Sale Transaction Fee(s) and Restructuring Fee payable to PJT Partners (excluding expenses) exceed $5,000,000.

(d)    Capital Raising Fee.  The Debtors shall pay the Advisor upon the closing of any financing arranged by the Advisor, a capital raising fee (the "Capital Raising Fee") calculated as follows: 1.0% of the total issuance size for debtor-in-possession financing; 1.0% of the total issuance size for senior debt; 2.0% of the total issuance size for junior debt financing; and 4.5% of the issuance amount for equity financing raised provided, however, that (i) the Advisor will credit 50% of any Capital Raising Fee against the applicable Restructuring Fee or Sale Transaction Fee; (ii) the Advisor will agreed to reduce its Capital Raising Fee by 50% for any financing or capital raised from (x) the parties listed on Schedule I to the Engagement Letter or (y) any then current equity holders, lenders, debt holders, other security holders, or creditors of the Debtors or any subsidiary of the Debtors or any of their respective affiliates, subsidiaries or affiliated funds;

(e)    Expense Reimbursements.  The Debtors shall reimburse the Advisor for all reasonable out-of-pocket expenses incurred during this engagement, including, but not limited to, travel and lodging, direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals, reasonable fees and expenses of

---

the most recent consolidated balance sheet of the Company prior to the consummation of such sale, exchange or purchase or (II) in the case of a sale or disposition of assets by the Company the principal amount of any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities indirectly or directly assumed or acquired, and (ii) any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities that are or otherwise repaid or retired, in connection with or in anticipation of the Sale Transaction. Consideration shall also include the aggregate amount of any extraordinary dividend or distribution made by the Company from the date hereof until the Closing of the Sale Transaction. Consideration shall include all amounts paid into escrow and all contingent payments payable in connection with the Sale Transaction, with fees on amounts paid into escrow to be payable upon the establishment of such escrow and fees on contingent payments to be payable when such contingent payments are made.  If the Consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such Consideration is paid.

For purposes of the Engagement Letter, the value of any securities (whether debt or equity) or other property paid or payable as part of the Consideration shall be determined as follows: (1) the value of securities that are freely tradable in an established public market will be determined on the basis of the last market closing price prior to the public announcement of the Sale Transaction; (2) the value of securities that are not freely tradable or have no established public market or, if the Consideration utilized consists of property other than securities, the value of such other property shall be the fair market value thereof as mutually agreed by the parties hereto; and (3) the value of any credit bid by any current lender or other holder of debt of the Company shall be equal to the face amount of such credit or debt.

10

Advisor's counsel and other necessary expenditures, and the Debtors shall pay the Advisor on the Effective Date and maintain thereafter a $25,000 expense advance for which the Advisor shall account upon termination of the engagement.

19.     If, at any time before the expiration of twelve (12) months following the termination of the Advisor engagement (except if the Advisor terminates its engagement without cause or is terminated for cause), a definitive agreement with respect to Restructuring or Sale Transaction, as applicable, is executed and a Restructuring or Sale Transaction is thereafter consummated, the Advisor is entitled to the Restructuring Fee or the Sale Transaction Fee. Pursuant to the Engagement Letter, "cause" shall mean gross negligence, fraud, willful misconduct, bad faith or a material and uncured breach of the Engagement Letter by the Advisor.

20.     The Debtors understand that the terms and conditions of the Advisor's employment are reasonable and comparable to compensation generally charged by investment bankers of a similar stature for comparable engagements, both in and out of court.  Given the numerous issues that the Advisor may be required to address in these Chapter 11 Cases, the Advisor's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for the Advisor's services for engagements of this nature in both out-of-court and chapter 11 contexts, the Debtors agree that the fee arrangements in the Engagement Letter are reasonable under the standards set forth below.

21.     The Debtors understand that the terms of the Advisor's employment and compensation, as described in the Engagement Letter, are consistent with employment and the type of compensation arrangements typically entered into by the Advisor when providing investment banking services. The Advisor's employment and compensation arrangements are competitive with those entered into by other investment banking firms when rendering

comparable services.  The Advisor and the Debtors believe that the foregoing compensation

requirements are both reasonable and market-based.

22.    In accordance with Local Rule 2016-2(B), the Debtors propose that (a) PJT

Partners be allowed to submit regular monthly invoices to the parties included in the Rule 9013-

3(D) Master Service List and (b) pursuant to Local Rule 2016-2(B), the Debtors be authorized to

pay up to 80% of fees and 100% of expenses on a monthly basis, subject to later court approval.[7]

23.    To the best of the Debtors' knowledge, information and belief, and except and to

the extent disclosed in the Baird Declaration, no promises have been received by the Advisor as

to compensation in connection with these Chapter 11 Cases other than as outlined in the

Engagement Letter, and the Advisor has no agreement with any other entity to share any

compensation received with any person other than the principals and employees of the Advisor.

## THE INDEMNIFICATION PROVISIONS ARE APPROPRIATE

24.    As more fully described in the indemnification, reimbursement and contribution

provisions set forth in the Indemnification Agreement attached as Attachment A to the

Engagement Letter (the "Indemnification Agreement"), the Debtors have agreed, among other

things, to indemnify and hold harmless the Advisor and other "Indemnified Parties" (as defined

in the Indemnification Agreement) from and against any losses, claims, damages, expenses and

liabilities whatsoever, whether they be joint or several (collectively, "Liabilities"), related to,

arising out of or in connection with the engagement (the "Engagement") under the Engagement

Letter.  The Debtors, however, will not be liable for any losses, claims, damages or liabilities (or

expenses relating thereto) that are finally judicially determined by a court of competent

jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct of an

---

[7]    By motion filed contemporaneously herewith, the Debtors have requested entry of an Order Establishing
Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals, by which PJT
Partners and certain other professionals would be compensated on an interim basis.

Indemnified Party (such provisions being the "Indemnification Provisions"). However, the following conditions will apply with respect to any such indemnification, reimbursement or contribution pursuant to the Indemnification Provisions:

(a)    All requests of Indemnified Parties for payment of indemnity, reimbursement or contribution pursuant to the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Court to ensure that payment of such indemnity, reimbursement or contribution conforms to the terms of the Engagement Letter and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity, reimbursement or contribution is sought; provided, however, that in no event shall Indemnified Party be indemnified in the case of its own bad faith, fraud, gross negligence or willful misconduct.

(b)    In the event that Indemnified Party seeks reimbursement from the Debtors for reasonable attorneys' fees in connection with a request by Indemnified Party for payment of indemnity, reimbursement or contribution pursuant to the Engagement Letter, the invoices and supporting time records from such attorneys shall be included in Indemnified Party's own application (both interim and final) and such invoices and time records shall be subject to the approval of the Court under the standards of sections 330 and 331 of the Bankruptcy Code without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code.

25.    The Debtors submit that such indemnification is standard in the specialized financial advisory industry and that the provision of such indemnification by the Debtors is fair and reasonable considering the Advisor's qualifications and the expectations of other special financial advisors in connection with engagements of this scope and size.

## APPROVAL OF ENGAGEMENT PURSUANT TO
## SECTION 328(a) OF THE BANKRUPTCY CODE

26.    Section 328 of the Bankruptcy Code provides, in relevant part, that a debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis."  11 U.S.C. §

328(a).    Thus, section 328(a) permits the Court to approve the terms of the Advisor's engagement as set forth in the Engagement Agreement, including the Fee Structure and the Indemnification Agreement.

27.    As recognized by numerous courts, Congress intended in section 328(a) to enable debtors to retain professionals pursuant to specific fee arrangements to be determined at the time of the court's approval of the retention, subject to reversal only if the terms are found to be "improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  11 U.S.C. § 328(a); *see Donaldson, Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 123 F.3d 861, 862–63 (5th Cir. 1997) ("If the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they will receive for their expertise and commitment."); *accord Riker, Danzig, Scherer, Hyland & Peretti LLP v. Official Comm. of Unsecured Creditors (In re Smart World Techs., LLC),* 383 B.R. 869, 874 (S.D.N.Y. 2008) (quoting *In re Nat'l Gypsum*, 123 F.3d at 862–63).

28.    The Debtors believe that the terms and provisions of the Engagement Letter, including the Fee Structure and the Indemnification Agreement, are reasonable terms and conditions of employment and should be approved under section 328(a) of the Bankruptcy Code. Such terms and provisions appropriately reflect (i) the nature of the services to be provided by the Advisor; and (ii) the fee structures and indemnification provisions typically utilized by the Advisor and other leading investment banking firms, which do not bill their time on an hourly basis and are generally compensated on a transactional basis.  In particular, the Debtors believe that the Fee Structure creates a proper balance between fixed and monthly fees based on the successful consummation of certain transactions.

14

29.     The Debtors submit that the terms and provisions of the Engagement Letter, including the Fee Structure and the Indemnification Agreement, are reasonable terms and conditions of employment in light of (i) industry practice; (ii) market ranges charged for comparable services both in and out of the chapter 11 context; and (iii) the Advisor's restructuring expertise as well as its capital markets knowledge and financing skills.

## MAINTENANCE OF TIME RECORDS

30.     The Advisor has requested, pursuant to section 328(a) of the Bankruptcy Code, payment of its fees on a monthly and fixed-rate basis, which is customary in the investment banking industry.  It is not the general practice of investment banking firms, including the Advisor, to keep detailed time records similar to those customarily kept by attorneys.  Because the Advisor is being compensated with a fixed Monthly Fee and a Restructuring Fee, Sale Transaction Fee or Capital Raising Fee, the Debtors request that the Advisor not be required to submit time records in support of its fee applications notwithstanding any requirements to the contrary in the Bankruptcy Rules, Local Rule 2016 and any other applicable procedures or orders of this Court.

31.     The Advisor will maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services.  The Advisor's applications for compensation and expenses will be paid by the Debtors pursuant to the terms of the Engagement Letter.  Except as necessary to comply with an applicable order, all such expense billings are in accordance with the Advisor's customary practices.

## NOTICE

32.     The Debtors will serve this Application on (a) the Core Parties and (b) any Non-ECF Parties (as those terms are defined in the Case Management Order) (collectively, the

15

"Notice Parties").  All parties who have requested electronic notice of filings in these cases through the Court's ECF system will automatically receive notice of this Application through the ECF system no later than the day after its filing with the Court.  A copy of this Application and any order approving it will also be made available on the Debtors' case information website (located at *https://cases.primeclerk.com/noranda*).  A copy of the Proposed Order will be made available on the Debtors' Case Information Website.  The Proposed Order may be modified or withdrawn at any time without further notice.  If any significant modifications are made to the Proposed Order, an amended Proposed Order will be made available on the Debtors' Case Information Website, and no further notice will be provided.  In light of the relief requested, the Debtors submit that no further notice is necessary.

## **NO PREVIOUS REQUEST**

33.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Date: February 17, 2016

*/s/ Dale W. Boyles*_____ _
Dale W. Boyles
Chief Financial Officer
Noranda Aluminum, Inc.

## <u>CERTIFICATE OF SERVICE</u>

Consistent with the Case Management Order, the Debtors will serve notice of this Application on all of the Interested Parties as well as all parties who have requested notice. All parties who have requested electronic notice of filings in these cases though the Court's ECF system will automatically receive notice of this Application through the ECF system. All other parties will be served this Application via electronic mail or First Class U.S. Mail. A copy of this Application and order approving it will also be made available on the Debtors' Case Information Website (located at *https://cases.primeclerk.com/noranda*).


*/s/Christopher J. Lawhorn*

## **EXHIBIT A**

**BAIRD DECLARATION**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| In re: | Case No. 16-10083-399 |
| **NORANDA ALUMINUM, INC.**, *et al.*, | Chapter 11 |
| Debtors. | Jointly Administered |

**DECLARATION OF JAMES H. BAIRD IN SUPPORT OF**
**DEBTORS' APPLICATION FOR AUTHORITY TO RETAIN**
**AND EMPLOY PJT PARTNERS LP AS INVESTMENT BANKER**
**TO THE DEBTORS AND DEBTORS-IN-POSSESSION**

I, JAMES H. BAIRD, make this declaration under 28 U.S.C. § 1746, and state:

1.    I am over 18 and competent to testify.  I am a Partner of PJT Partners LP ("PJT Partners" or the "Advisor"), a financial advisory firm with its principal offices located at 280 Park Avenue, New York, NY 10017.  I am authorized to execute this declaration (the "Declaration") on behalf of the Advisor.

2.    I am authorized to submit this declaration in support of the *Debtors' Application for Authority the Retain and Employ PJT Partners LP as Investment Banker to the Debtors and Debtors-in-Possession* (the "Application")[1] of Noranda Aluminum, Inc. and its above-captioned debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") to employ and retain the Advisor in accordance with the terms and conditions set forth in that certain engagement letter dated November 6, 2015, which was amended and restated on January 25, 2016 (the "Engagement Letter"), a copy of which is attached to the Application as Exhibit C and incorporated by reference herein.

---

[1]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Application.

3.      The facts set forth in this Declaration are based upon my personal knowledge, information and belief, or client matter records kept in the ordinary course of business that were reviewed either by me or other employees of the Advisor under my supervision and direction.  If called and sworn as a witness, I could and would testify competently to the facts set forth herein.

### THE ADVISOR'S QUALIFICATIONS

4.      PJT Partners is part of a leading independent financial advisory firm, whose restructuring group, which consists of Blackstone Advisory Partners L.P.'s ("Blackstone") historical restructuring and reorganization business, is one of the world's leading restructuring advisors.  PJT Partners is a wholly owned subsidiary of PJT Partners Holdings LP, of which PJT Partners, Inc. acts as sole general partner.  PJT Partners Inc. was formed in part through a multi-step merger and spin off transaction whereby Blackstone's restructuring and advisory groups were spun-off to form PJT Partners and its affiliated operating entities. The PJT Partners restructuring professionals (also in their former capacity as Blackstone employees) have been conducting business and providing to their clients the same high quality restructuring services that Blackstone had itself provided since the formation of its restructuring advisory practice in 1991.  PJT Partners' restructuring group has approximately 60 employees globally.

5.      The Advisor's professionals have extensive experience working with financially troubled companies in complex financial restructurings.  The members and senior executives of the Advisor's restructuring and reorganization practice (whether as employees of PJT Partners or Blackstone) have assisted and advised numerous chapter 11 debtors in the development of plans of reorganization and are experienced in analyzing restructuring and related chapter 11 issues. The members and senior executives of the Advisor's restructuring and reorganization practice (also in their former capacity as Blackstone employees) have been particularly active in large, complex and high-profile bankruptcies and restructurings, having advised in the following

2

matters, among others, in their chapter 11 reorganizations:    AbitibiBowater Inc.; Adelphia Communications Corporation; Ambac Financial Group, Inc.; Apex Silver Mines Ltd.; Arch Coal, Inc.; Caesars Entertainment Operating Corporation; Cengage Learning, Inc.; Delta Air Lines, Inc.; Dynegy Inc.; Eastman Kodak Company; Edison Mission Energy; Energy Future Holdings Corporation; Enron Corporation; Excel Maritime Carriers, Ltd.; Flag Telecom Holdings Limited; Flying J. Inc.; Genco Shipping & Trading Limited; General Motors Corporation; Global Crossing Ltd.; Houghton Mifflin Harcourt Publishing Company; Lee Enterprises Inc.; LightSquared Inc.; Los Angeles Dodgers LLC; LyondellBasell Industries; Mirant Corp.; NewPage Corporation; NTK Holdings, Inc.; Patriot Coal Corporation; SemGroup; TerreStar Networks Inc.; Tribune Company; Walter Energy, Inc.; W.R. Grace & Co.; and Winn-Dixie Stores, Inc.  In addition, the restructuring group has provided general restructuring advice to such major companies as Clearwire Corporation, Ford Motor Company, The Goodyear Tire & Rubber Company and Xerox Corporation.

6.    The members and senior executives of the Advisor's financial advisory practice (whether as employees of PJT Partners or Blackstone) have assisted and advised numerous clients conducting mergers and acquisitions in chapter 11 proceedings and in the metals and mining sector, having advised in the following transactions, among others: Peabody's acquisition of Macarthur Coal, Joy Global's acquisition of IMM, the sale of Alcan to Rio Tinto, the pending sale of Walter Energy's core mining assets to its lender group and the sale of Walter Energy's non-core mining assets and Coke business to ERP Compliant Fuels.

7.    Since its engagement in November 2015, the Advisor has advised the Debtors in connection with their efforts to raise capital and explore restructuring alternatives.  During this time, the Advisor has become intimately familiar with the Debtors' businesses, affairs, assets and

contractual arrangements. The Advisor has worked closely with the Debtors to analyze the Debtors' financial positions and to assist the Debtors in evaluating various restructuring options. Accordingly, the Advisor has the necessary background to deal effectively and efficiently with many financial issues and problems that may arise in the context of the Debtors' Chapter 11 Cases.

8.     As a result of the prepetition work performed on behalf of the Debtors, the Advisor has acquired significant knowledge of the Debtors' financial affairs, debt structure, business operations, capital structure, key stakeholders, financing documents and other related material information. Likewise, in providing prepetition services to the Debtors, the Advisor's professionals have worked closely with the Debtors' management, board of directors and other advisors. Accordingly, as a result of the Advisor's representation of the Debtors prior to the commencement of these Chapter 11 Cases and the Advisor's extensive experience in representing chapter 11 debtors, the Advisor is well qualified to provide these services and represent the Debtors during their Chapter 11 Cases.

## <u>SERVICES TO BE PROVIDED</u>[2]

9.     Subject to further order of this Court, and in accordance with the terms of the Engagement Letter, the Debtors request the employment and retention of the Advisor to render certain of the following investment banking services to the Debtors as necessary, appropriate and feasible and as may be requested by the Debtors:

    (a)     assist in evaluating of the Debtors' businesses and prospects;

    (b)     assist in developing a long-term business plan and related financial projections for the Debtors and their subsidiaries;

---

[2]   The following is a summary and is qualified in its entirety by the descriptions in the Engagement Letter. Unless otherwise defined herein or in the Application, all capitalized terms shall have the meanings ascribed to them in the Engagement Letter.

(c)     assist in the development of financial data and presentations to the Debtors' Board of Directors, various creditors and other third parties;

(d)     analyze the financial liquidity of the Debtors and evaluate alternatives to improve such liquidity;

(e)     analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of those stakeholders impacted by the Restructuring;

(f)     provide strategic advice with regard to restructuring or refinancing the Debtors' Obligations;

(g)     evaluate the Debtors' debt capacity and alternative capital structures;

(h)     participate in negotiations with creditors, suppliers, lessors, employee representatives and other interested parties;

(i)     value securities offered in connection with a restructuring of the Debtors;

(j)     advise the Debtors and negotiate with lenders with respect to potential waivers or amendments of various credit facilities;

(k)     assist in arranging financing for the Debtors, as requested;

(l)     provide expert witness testimony relating to any of the subjects encompassed by the other investment banking services;

(m)     assist the Debtors in preparing marketing materials in conjunction with a possible Sale Transaction;

(n)     assist the Debtors in identifying potential buyers or parties in interest to a Sale Transaction and assist in the due diligence process;

(o)     assist and advise the Debtors concerning the terms, conditions and impact of any proposed Sale Transaction; and

(p)     provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring or Sale Transaction, as requested and mutually agreed.

## **PROFESSIONAL COMPENSATION**

10.     The Advisor's decision to advise and assist the Debtors in connection with these Chapter 11 Cases is subject to its ability to be retained in accordance with the terms of the Engagement Letter pursuant to section 328(a), and not section 330, of the Bankruptcy Code.

11.     Specifically, the Engagement Letter provides for the following compensation (the

"Fee Structure"):

(a)     <u>Monthly Fee</u>.  During the term of the Engagement Letter, the Debtors shall pay the Advisor a monthly advisory fee equal to $175,000 per month, payable in advance in cash, with the first Monthly Fee payable upon execution of the original Engagement Letter and additional installments of such Monthly Fee payable in advance on each subsequent monthly anniversary of the Effective Date;

(b)     <u>Restructuring Fee</u>.  The Debtors shall pay the Advisor an additional fee (the "<u>Restructuring Fee</u>") equal to $5,000,000 payable upon the closing of a Restructuring.[3]  The Debtors and PJT Partners acknowledge and agree that:  (I) to the extent paid, any Restructuring Fee payable to PJT Partners shall be reduced by any Sale Transaction Fees previously paid to PJT Partners and (II) in no circumstances shall the total amount of Sale Transaction Fee(s) and Restructuring Fee payable to PJT Partners (excluding expenses) exceed $5,000,000.

(c)     <u>Sale Transaction Fees</u>.  The Debtors shall pay the Advisor upon the consummation of a Sale Transaction, a sale transaction fee (the "<u>Sale Transaction Fee</u>") payable in cash directly out of the gross proceeds of the Sale Transaction or other available funds calculated as 1.25% of the Consideration.[4]  The Debtors and PJT Partners acknowledge and agree

---

[3]   For purposes of the Engagement Letter, a Restructuring shall be deemed to have been consummated upon the earlier of (a) the execution, confirmation and consummation of a plan of reorganization pursuant to an order of the Bankruptcy Court or (b) the transfer of the Company's assets remaining after consummating at least one Sale Transaction into a liquidating trust or similar vehicle through which the Company's remaining assets are to be sold or liquidated pursuant to a Bankruptcy Court order approving same.

[4]   For purposes of the Engagement Letter, "Consideration" means the gross value of all cash, securities and other properties paid or payable, directly or indirectly, in one transaction or in a series or combination of transactions, in connection with the Sale Transaction or a transaction related thereto (including, without limitation, amounts paid (A) pursuant to covenants not to compete or similar arrangements and (B) to holders of any warrants, stock purchase rights, convertible securities or similar rights and to holders of any options or stock appreciation rights, whether or not vested). Consideration shall also include (i) (I) in the case of the sale, exchange or purchase of the Company's equity securities the principal amount of any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities as set forth on the most recent consolidated balance sheet of the Company prior to the consummation of such sale, exchange or purchase or (II) in the case of a sale or disposition of assets by the Company the principal amount of any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities indirectly or directly assumed or acquired, and (ii) any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities that are or otherwise repaid or retired, in connection with or in anticipation of the Sale Transaction. Consideration shall also include the aggregate amount of any extraordinary dividend or distribution made by the Company from the date hereof until the Closing of the Sale Transaction. Consideration shall include all amounts paid into escrow and all contingent payments payable in connection with the Sale Transaction, with fees on amounts paid into escrow to be payable upon the establishment of such escrow and fees on contingent payments to be payable when such contingent payments are made.  If the Consideration to be paid is computed in

that: (i) PJT Partners shall be paid a Sale Transaction Fee with respect to each Sale Transaction consummated by the Debtors, (ii) to the extent paid, all Sale Transaction Fees shall be credited against any Restructuring Fee payable to PJT Partners and (iii) in no circumstances shall the total amount of the Sale Transaction Fee(s) and Restructuring Fee payable to PJT Partners (excluding expenses) exceed $5,000,000.

(d)    Capital Raising Fee.  The Debtors shall pay the Advisor upon the closing of any financing arranged by the Advisor, a capital raising fee (the "Capital Raising Fee") calculated as follows: 1.0% of the total issuance size for debtor-in-possession financing; 1.0% of the total issuance size for senior debt; 2.0% of the total issuance size for junior debt financing; and 4.5% of the issuance amount for equity financing raised provided, however, that (i) the Advisor will credit 50% of any Capital Raising Fee against the applicable Restructuring Fee or Sale Transaction Fee; (ii) the Advisor will agreed to reduce its Capital Raising Fee by 50% for any financing or capital raised from (x) the parties listed on Schedule I to the Engagement Letter or (y) any then current equity holders, lenders, debt holders, other security holders, or creditors of the Debtors or any subsidiary of the Debtors or any of their respective affiliates, subsidiaries or affiliated funds;

(e)    Expense Reimbursements.  The Debtors shall reimburse the Advisor for all reasonable out-of-pocket expenses incurred during this engagement, including, but not limited to, travel and lodging, direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals, reasonable fees and expenses of Advisor's counsel and other necessary expenditures, and the Debtors shall pay the Advisor on the Effective Date and maintain thereafter a $25,000 expense advance for which the Advisor shall account upon termination of the engagement.

12.    If, at any time before the expiration of twelve (12) months following the termination of the Advisor engagement (except if the Advisor terminates its engagement without

---

any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such Consideration is paid.

For purposes of the Engagement Letter, the value of any securities (whether debt or equity) or other property paid or payable as part of the Consideration shall be determined as follows: (1) the value of securities that are freely tradable in an established public market will be determined on the basis of the last market closing price prior to the public announcement of the Sale Transaction; (2) the value of securities that are not freely tradable or have no established public market or, if Consideration utilized consists of property other than securities, the value of such other property shall be the fair market value thereof as mutually agreed by the parties hereto; and (3) the value of any credit bid by any current lender or other holder of debt of the Company shall be equal to the face amount of such credit or debt.

cause or is terminated for cause), a definitive agreement with respect to Restructuring or Sale Transaction, as applicable, is executed and a Restructuring or Sale Transaction is thereafter consummated, the Advisor is entitled to the Restructuring Fee or the Sale Transaction Fee. Pursuant to the Engagement Letter, "cause" shall mean gross negligence, fraud, willful misconduct, bad faith or a material and uncured breach of the Engagement Letter by the Advisor.

13.    The Advisor has requested, pursuant to section 328(a) of the Bankruptcy Code, payment of its fees on a monthly and fixed-rate basis, which is customary in the investment banking industry.  It is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys.

14.    Accordingly, if the Application is granted, the Advisor requests to file fee applications for the allowance of compensation for services rendered at 120-day intervals and to receive monthly payment from Debtors for reimbursement of fees and expenses incurred in accordance with Local Rule 2016-2(B) and any other applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable orders of this Court.  Because the Advisor is being compensated with a fixed Monthly Fee, Capital Raising Fee, Sale Transaction Fee and/or Restructuring Fee, the Advisor requests that it not be required to submit time records in support of its fee applications.

15.    The Fee Structure is consistent with, and typical of, compensation arrangements entered into by the Advisor and other comparable firms in connection with the rendering of similar services under similar circumstances.  The Advisor's strategic and financial expertise, as well as its restructuring capabilities, some or all of which has and will be required by the Debtors during the term of the Advisor's engagement, were all important factors in determining the Fee Structure.  The Debtors and the Advisor have agreed upon the Fee Structure in anticipation that a

substantial commitment of professional time and effort will be required of the Advisor and its professionals in connection with these Chapter 11 Cases and in light of the fact that: (i) such commitment may foreclose other opportunities for the Advisor; and (ii) the actual time and commitment required of the Advisor and its professionals to perform its services under the Engagement Letter may vary substantially from week-to-week and month-to-month, creating "peak load" issues for the Advisor.

16.     As of the Petition Date, the Debtors do not owe the Advisor any fees for services performed or expenses incurred under the Engagement Letter.  According to the books and records of the Debtors, during the 90-day period before the Petition Date, the Advisor received approximately $700,000.00 for professional services performed and approximately $13,927.00 for expenses incurred.[5]  Separately, the Advisor has received a prepetition expense deposit of $25,000 that will be applied against any prepetition expenses incurred but not yet received due to delay in third-party vendors in providing invoices, with the remaining balance, if any, returned to the Debtors.

### INDEMNIFICATION, CONTRIBUTION AND REIMBURSEMENT OF ADVISOR

17.     As part of the overall compensation payable to Advisor under the terms of the Engagement Letter, the Debtors have agreed to certain indemnification, contribution and reimbursement obligations set forth in the Indemnification Agreement and incorporated herein by reference.  As more fully described in the indemnification, reimbursement and contribution provisions set forth in the Indemnification Agreement attached as Attachment A to the Engagement Letter (the "Indemnification Agreement"), the Debtors have agreed, among other

---

[5]     The approximate funds paid to the Advisor in the 90-day period preceding filing cover fees and expenses for the period beginning November 6, 2015 and ending March 5, 2016.  This does not include expenses incurred but not yet received due to delay in third-party vendors in providing invoices.  To the extent the Advisor receives invoices for prepetition expenses that exceed the expense deposit, the Advisor will waive those expenses.

things, to indemnify and hold harmless the Advisor and other "Indemnified Parties" (as defined

in the Indemnification Agreement) from and against any losses, claims, damages, expenses and

liabilities whatsoever, whether they be joint or several (collectively, "Liabilities"), related to,

arising out of or in connection with the engagement (the "Engagement") under the Engagement

Letter.  The Debtors, however, will not be liable for any losses, claims, damages or liabilities (or

expenses relating thereto) that are finally judicially determined by a court of competent

jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct of an

Indemnified Party (such provisions being the "Indemnification Provisions").  However, the

following conditions will apply with respect to any such indemnification, reimbursement or

contribution pursuant to the Indemnification Provisions:

> (a) All requests of Indemnified Parties for payment of indemnity, reimbursement or contribution pursuant to the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Court to ensure that payment of such indemnity, reimbursement or contribution conforms to the terms of the Engagement Letter and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity, reimbursement or contribution is sought; provided, however, that in no event shall Indemnified Party be indemnified in the case of its own bad faith, fraud, gross negligence or willful misconduct.

> (b) In the event that Indemnified Party seeks reimbursement from the Debtors for reasonable attorneys' fees in connection with a request by Indemnified Party for payment of indemnity, reimbursement or contribution pursuant to the Engagement Letter, the invoices and supporting time records from such attorneys shall be included in Indemnified Party's own application (both interim and final) and such invoices and time records shall be subject to the approval of the Court under the standards of sections 330 and 331 of the Bankruptcy Code without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code.

18.    I believe that the Indemnification Provisions are customary and reasonable terms

of consideration for investment bankers such as the Advisor in connection with in-court and out-

of-court restructuring activities.  The Advisor negotiated the Engagement Letter, including the Indemnification Provisions, with the Debtors in good faith and at arm's length.

## EFFORTS TO AVOID DUPLICATION OF SERVICES

19.      The Advisor's services are intended to complement, and not duplicate, the services to be rendered by any other professional retained by the Debtors in the Chapter 11 Cases.  The Advisor has informed the Debtors that it understands the Debtors have retained and may retain additional professionals during the term of the engagement and will use its reasonable efforts to work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors.

## ADVISOR'S DISINTERESTEDNESS

20.      In connection with its proposed retention by the Debtors in these cases, the Advisor undertook to determine whether it had any conflicts or other relationships that might cause it not to be disinterested or to hold or represent an interest adverse to the Debtors.  Annah Kim-Rosen, PJT Partners' Chief Compliance Officer (the "Chief Compliance Officer"), who is responsible for, among other things, the day-to-day operation of the compliance function at the Advisor.  As part of that job, she oversees the employees who maintain, for purposes of monitoring and avoiding conflicts of interest, she maintains, for purposes of monitoring and avoiding conflicts of interest, a list (the "Restricted List") of companies with which the Advisor or one of its affiliates is doing business, either as an advisor or with respect to which PJT Partners is in possession of material nonpublic information or has entered into a confidentiality agreement.  The Chief Compliance Officer and her staff have received the names of individuals and entities that may be parties-in-interest in these Chapter 11 Cases (the "Parties-in-Interest List") attached as Schedule 1 to Kim-Rosen Declaration, which is attached as Exhibit B to the Application, and have compared this to the Restricted List to determine the existence of any

possible conflicts (the "Conflict Check"), the results of which are disclosed in the Kim-Rosen Declaration.

21.    As part of its diverse practice, the Advisor appears in numerous cases, proceedings and transactions involving many different professionals, including attorneys, accountants, investment bankers and financial consultants, some of whom may represent claimants and parties-in-interest in the Debtors' Chapter 11 Cases.  Further, the Advisor has in the past been, and may in the future be, represented by several attorneys and law firms in the legal community, some of whom may be involved in this proceeding.  In addition, the Advisor has in the past worked, and will likely in the future work, with or against other professionals involved in this case in matters unrelated to this case.  Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these business relations constitutes interests materially adverse to the Debtors' estates herein, and none are in connection with these cases.

22.    The Advisor and certain of its members and employees may have represented, may currently represent and likely will represent, in matters wholly unrelated to the Debtors' Chapter 11 Cases, entities that are listed on the Parties-in-Interest List.

23.    The Advisor does not believe that any of their involvement with any of the entities in the Parties-in-Interest List will adversely affect the Debtors in any way.  The Advisor has not represented, does not represent and will not represent any entity on the Parties-in-Interest List in the Debtors' Chapter 11 Cases nor have any relationship with any such entity which would be adverse to the Debtors.  The Advisor does not believe that any potential relationship it may have with any entity on the Parties-in-Interest List would interfere with or impair the Advisor's representation of the Debtors in their Chapter 11 Cases.

24.     Given the size and breadth of PJT Partners' client base, it is possible that the Advisor may now or in the future be retained by one or more of the entities on the Parties-in-Interest List in unrelated matters without my knowledge.  In addition, the Debtors have numerous customers, creditors and other parties with whom they may maintain business relationships and some may not be included as an entity on the Parties-in-Interest List.  I have informed the Debtors that PJT Partners will conduct an ongoing review of its electronic files to ensure that no disqualifying circumstances have arisen.  To the extent that the Advisor discovers any such parties, or enters into any new, material relationship with an entity on the Parties-in-Interest List, it will supplement this disclosure to the Court promptly.  Other than as disclosed herein, to the best of my knowledge, the Advisor has no other relationship with the Debtors of which I am aware.

25.     To the best of my knowledge, except as set forth in the Kim-Rosen Declaration: (i) the Advisor has no relevant connection with any of the Debtors, the Debtors' creditors, any person employed in the office of the U.S. Trustee or any other party with an actual or potential interest in these Chapter 11 Cases or their respective attorneys or accountants; (ii) the Advisor (and the Advisor's professionals) are not creditors, equity security holders or insiders of any of the Debtors; (iii) neither the Advisor nor any of its professionals is or was, within two years of the Petition Date, a director, officer, or employee of the Debtors; and (iv) neither the Advisor nor its professionals holds or represents an interest materially adverse to the Debtors, their estates or any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in the Debtors, or for any other reason.  Accordingly, I believe that the Advisor is a "disinterested person" as defined in section 101(14) of the Bankruptcy Code, as

modified by section 1107(b) of the Bankruptcy Code and the Advisor's employment is permissible under sections 327(a) and 328(a) of the Bankruptcy Code.

26.     I am not related or connected to and, to the best of my knowledge, no other professional of the Advisor who will work on this engagement is related or connected to, any United States Bankruptcy Judge for the Eastern District of Missouri, any of the District Judges for the Eastern District of Missouri who handle bankruptcy cases or any employee in the Office for the United States Trustee for the Eastern District of Missouri.

27.     No promises have been received by the Advisor as to compensation in connection with the Chapter 11 Cases, other than as outlined in the Engagement Letter, and the Advisor has no agreement with any other entity to share any compensation received with any person other than the principals and employees of the Advisor.

28.     The Advisor will periodically review its files during the pendency of its engagement by the Debtors to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new relevant facts or relationships are discovered or arise during the pendency of these Chapter 11 Cases, the Advisor will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration as required by Bankruptcy Rule 2014.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, to the best of my information, knowledge and belief.

Dated: February 17, 2016

By: */s/ James H. Baird*    
    James H. Baird
    Partner
    PJT Partners L.P.

**<u>EXHIBIT B</u>**

**KIM-ROSEN DECLARATION**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| **In re:** | **Case No. 16-10083-399** |
| **NORANDA ALUMINUM, INC.,** *et al.*, | **Chapter 11** |
| Debtors. | **Jointly Administered** |

**DECLARATION OF ANNAH KIM-ROSEN IN SUPPORT**
**OF DEBTORS APPLICATION FOR AUTHORITY TO RETAIN**
**AND EMPLOY PJT PARTNERS LP AS INVESTMENT BANKER**
**TO THE DEBTORS AND DEBTORS-IN-POSSESSION**

I, Annah Kim-Rosen, declare:

1.       I am the Chief Compliance Officer of PJT Partners, LP ("PJT Partners" or the "Advisor").  As part of my job, I am responsible for maintaining, for purposes of monitoring and avoiding conflicts of interest, a list of companies with which PJT Partners or one of its affiliates is doing business, either as an advisor or with respect to which PJT Partners or one of its affiliates is in possession of material, nonpublic information or has entered into a confidentiality agreement.

2.       On February 12, 2016, my colleagues and I received a list of Parties-In-Interest ("PII") from the above-captioned debtors and debtors-in-possession (the "Debtors"), which is attached hereto as Schedule 1.

3.       I have undertaken a review of the PII to determine possible connections relating to the Debtors and, subject to the foregoing limitations and the following disclosures, no material connections have been found:

a. PJT Partners has been engaged to provide financial advisory services to a group of lenders to Paragon Offshore plc's chapter 11 case. Affiliates of some of the PII are lenders to Paragon Offshore plc. This engagement is wholly unrelated to the Debtors and these chapter 11 cases, and PJT Partners does not believe that the interests of the Debtors or their estates are adversely affected by this engagement.

b. PJT Partners has been engaged to provide financial advisory services to Verso Corporation in connection with Verso Corporation's chapter 11 case. O'Melveny & Meyers LLP, one of the PII, is counsel to Verso Corporation. This engagement is wholly unrelated to the Debtors and these chapter 11 cases, and PJT Partners does not believe that the interests of the Debtors or their estates are adversely affected by this engagement.

c. PJT Partners has been engaged to provide financial advisory services to Magnetation LLC in connection with Magnetation LLC's chapter 11 case. PJT Partners has also been engaged to provide financial advisory services to Arch Coal, Inc. in connection with Arch Coal, Inc.'s chapter 11 case. Davis Polk & Wardwell LLP, one of the PII, is counsel to Magnetation LLC and Arch Coal, Inc. These engagements are wholly unrelated to the Debtors and these chapter 11 cases, and PJT Partners does not believe that the interests of the Debtors or their estates are adversely affected by these engagements.

4. The Advisor currently holds no direct or indirect interest in any debt or equity securities of the Debtors.

5. To the best of my knowledge, except as disclosed herein: (i) PJT Partners has no material connection with any of the Debtors, the Debtors' creditors, the United States Trustee for the Eastern District of Missouri (the "U.S. Trustee"), any person employed in the office of the U.S. Trustee or any other party with an actual or potential interest in these chapter 11 cases or their respective attorneys or accountants; (ii) PJT Partners (and PJT Partners' professionals) are not creditors, equity security holders or insiders of any of the Debtors; (iii) neither PJT Partners nor any of its professionals is or was, within two years of the date of the Debtors' filing of these chapter 11 cases, a director, officer, or employee of the Debtors; and (iv) neither PJT Partners nor its professionals holds or represents an interest materially adverse to the Debtors, their

2

estates or any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in the Debtors, or for any other reason. Accordingly, I believe that PJT Partners is a "disinterested person" as defined in section 101(14) of title 11 of the United States Code (the "Bankruptcy Code"), as modified by section 1107(b) of the Bankruptcy Code and PJT's employment is permissible under sections 327(a) and 328(a) of the Bankruptcy Code.

6.     PJT Partners has performed reasonable due diligence for possible conflicts with the PII in the Debtors' chapter 11 cases. The following is a list of the categories that PJT Partners has searched with respect to the PII:

    a.     Debtors;

    b.     Non-Debtor Affiliates and Subsidiaries;

    c.     Administrative Agents;

    d.     Indenture Trustee;

    e.     Bankruptcy Judges;

    f.     Bankruptcy Professionals;

    g.     Lenders;

    h.     Bondholders;

    i.     Banks;

    j.     Significant Customers;

    k.     Directors and Officers;

    l.     Permit Issuers and Regulators relevant to the Debtors;

    m.     Relevant Taxing Authorities;

    n.     Insurance Providers;

    o.     Landlords;

        p.        Litigation Counterparties;

        q.        Ordinary Course Professionals;

        r.        Non-Lender Secured Parties;

        s.        Significant Competitors;

        t.        Significant Shareholders;

        u.        30 Largest Unsecured Creditors;

        v.        Personnel in U.S. Trustee's Office;

        w.        Unions;

        x.        Utility Providers; and

        y.        Key Vendors.

6.      The list of PII was provided by the Debtors and may change during the pendency of the Debtors' chapter 11 cases.  Should the Advisor learn that a relationship with any of the PII should be disclosed in the future, a supplemental declaration with such disclosure will be promptly filed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  February 17, 2016

By: /s/ Annah Kim-Rosen_____
    Annah Kim-Rosen
    Chief Compliance Officer, PJT Partners LP

<u>**SCHEDULE 1 TO EXHIBIT B**</u>

**LIST OF POTENTIAL PARTIES IN INTEREST**

**(A) DEBTORS, NON-DEBTOR AFFILIATES, AND SUBSIDIARIES**

NHB Capital, LLC

Noranda Bauxite Holdings Ltd.

Noranda Bauxite Ltd.

Gramercy Alumina Holdings II, Inc.

Gramercy Alumina Holdings Inc.

Noranda Alumina LLC

Noranda Aluminum Acquisition Corporation

Noranda Aluminum Holding Corporation

Noranda Aluminum, Inc.

Noranda Intermediate Holding Corporation

Norandal USA, Inc.

Noranda Jamaica Bauxite Partners

**(B) ADMINISTRATIVE AGENTS**

Bank of America, N.A.

Cortland Capital Market Services LLC

**(C) INDENTURE TRUSTEE**

U.S. Bank National Association

**(D) BANKRUPTCY JUDGES**

Chief Judge Kathy Surratt-States

Judge Barry S. Schermer

Judge Charles E Rendlen, III

**(E) BANKRUPTCY PROFESSIONALS**

Alvarez & Marsal North America, LLC

Paul, Weiss, Rifkind, Wharton & Garrison LLP

PJT Partners

Prime Clerk

**(F) LENDERS**

3i Debt Management US LLC

Aegon USA Investment Management LLC

Allianz Global Investors US LLC

Atrium XI

Bank of America

Bank of America, N.A.

Barclays

Bentham Wholesale Syndicated

BlueMountain Capital Management, LLC

Boston Management and Research

Carlson Capital LP

Carlyle Investment Management LLC

Centerbridge Group

Citibank

Citibank, N.A.

Columbia Management Investment Advisers LLC

Credit Suisse

Credit Suisse

Credit Suisse AG

Credit Suisse Alternative Capital LLC

Eaton Vance Management Inc.

Foothill Capital Corporation

Fraser Sullivan Investment Management LLC

GoldenTree Asset Management, LP

Goldman Sachs Group, Inc. (The)

Guggenheim Investment Management, LLC

Guggenheim Partners Asset Management, LLC

Guggenheim Partners Investment

Guggenheim Partners Investment Management LLC

H.I.G. Whitehorse Capital LLC

Hotchkis & Wiley Capital Management

JP Morgan

Madison Park Funding IV

Madison Park Funding VIII

Madison Park Funding XV

MJX Asset Management, LLC

Napier Park Global Capital LP

Nomura Corporate Research and Asset Management Inc.

Siemens

Silvermine Capital Management LLC

Sound Harbor Partners

Strategic Value Partners, LLC

Surela Investments Ltd. (Sherwin Alumina)

UBS

US Bank

Wells Fargo

Whitehorse Capital Partners LP

**(G) BONDHOLDERS**

Brownstone Investment Group, LLC

Concise Capital, LLC

Credit Suisse Asset Management, LLC (U.S.)

Euroclear Bank

Fidelity International Limited - FIL Investment Services (U.K.), Ltd.

Fore Research & Management, L.P.

Garland Business Corp

Hotchkis and Wiley Capital Management, LLC

J.P. Morgan Investment Management, Inc.

Morgan Stanley Wealth Management

NNIP Advisors B.V.

Nomura Corporate Research and Asset Management, Inc. (U.S.)

Stocks and Securities, Ltd.

Third Avenue Management, LLC

Tocqueville Asset Management, L.P.

UBS Securities, LLC

**(H) BANKS**

Bank of America

M & T Bank

JP Morgan Chase

Fifth Third Bank

Bank of Nova Scotia

National Commercial Bank

**(I) SIGNIFICANT CUSTOMERS**

3M Company

A. J. Oster West, Inc.

AAF-McQuay Inc.

AAON Coil Products, Inc.

ABB Inc.

AKG North American Operations

Alcoa

All Foils Inc.

AMS

ARG International AG

Ascend Custom Extrusions, LLC

Autoneum North America, Inc.

Avery Dennison Corporation

Bard Manufacturing

Berry Plastics Corp.

Bohn de Mexico, S.A. de C.V.

2

Brady Corporation

Brazeway Inc.

BRT Extrusions, Inc.

C & H Die Casting

Cadillac Products Packaging Company

Carrier Air Conditioning

Carrier Mexico S.A. de C.V.

CBC Metals Processing

Central Moloney, Inc.

Century Aluminum Company

Century Aluminum of Sebree LLC

Chief Industries

Claridge Products & Equip Inc.

Claridge Products & Equipment

Coating Excellence International

Coilmaster Corporation

Colmac Coil Manufacturing Inc.

Comet Metals Co.

Conductores Monterrey, S.A. de C.V.

Constellium

Cooper Industries/RTE

Crown Extrusions, Inc.

Custom Aluminum Products, Inc.

Custom Grinders

Custom Laminating Corporation

D & W Fine Pack

Daikin Applied

Dee Zee, Inc.

Des Champs Laboratories

DRS-Marlo Coil

Durable, Inc.

Electric Research & Manufacturing Co.

Electromanufacturas, S. de R.L. de C.V.

Elixir Extrusions, LLC

Elringklinger USA, Inc.

Encore Wire Corporation

Evapco, Midwest

FCA US

Flexcon Industrial, LLC

Gateway Extrusions, Ltd.

General Cable Corporation

General Cable de Mexico, S.A. de C.V.

General Motors Components Hold

GEO Specialty Chemicals

Gibbs Die Casting Corporation

Glencore Ltd.

Glitterex Corporation

H & W Wire Corp.

Handi-Foil

Howard Industries

Hydro Aluminum

Hydro Aluminum North America

Ideal Tape Co., Inc.

Intertape Polymer Group

J M Huber Corporation

J. Aron & Co.

James Hardie Building Products

JBC Technologies

Kemira Water Solutions, Inc.

KY Assoc. of Electric Coop.

Lasalle Bristol Corporation

Lennox Industries, Inc.

Leroy Somer North America

Liebert Corporation

Lite Gauge Metals

Luvata Heatcraft

3

Lydall Thermal/Acoustical

Lynch Metals

Marley Electric Heating Co.

Marubeni America Corp./Detroit

Medalco Metals, Inc.

Metal Exchange Corp.

Mitsubishi International Corporation

Modine Manufacturing Co.

Nehring Electrical Works Co

New Age Industrial Corp Inc.

Nordyne Inc.

Peerless of America, Inc.

Penn Aluminum International LLC

Penny Plate Inc.

Ply Gem

Porocel Industries, LLC

Power Partners, Inc.

PQ Corporation

Printpack, Inc.

Prolec GE International

Prometco

Prysmian Cables and Systems USA LLC

REA Magnet Wire Co. Inc.

Research Products Corp.

Revere Packaging

Rheem Manufacturing Company

RPS Products

Samuel

Scepter Resources

Shurtape Technologies, Inc.

Siemens Energy, Inc.

Siplast Incorporated

Smart USA

Snap-Lok, Inc.

Southeastern Tool & Die

Southern Ionics

Southwest Electric Company

Sun Process Converting, Inc.

Super Radiator Coils

Superior Essex

Superior Essex Communications

Superior Essex International LP

Superior Extrusion, Inc.

Swarco

Temtrol

The Okonite Company

The Trident Company

Three D Metals, Inc.

Thyssenkrupp Materials NA

Tower Extrusions

Trafigura Trading LLC

Trane Air Conditioning

Trinidad Benham Corp

UOP, LLC

US Alco

Ventrol Air Handling Systems Inc.

W. R. Grace & Co.

Western Extrusion Corporation

Western Plastics Inc.

## (J) DIRECTORS & OFFICERS

Alan H. Schumacher

Antoine Liddell

Carl J. Rickertsen

Carol R. Clifton

Dale W. Boyles

4

Donald J. Suray

Elliot G. Sagor

Gail E. Lehman

Greg L. North

John Habisreitinger

Julio C. Diniz Costa

Layle K. Smith

Michael J. Griffin

Mike Fox

Nina A. Corey

Pansy Johnson

Pasquale "Pat" Fiore

Patrice Niedbalski

Richard B. Evans, Chairman

Ronald S. Rolfe

Scott M. Croft

Stephen Robuck

Thomas R. Miklich

Todd D. Barrett

William H. Brooks

## (K) PERMIT ISSUERS AND REGULATORS RELEVANT TO THE DEBTORS

Government of Jamaica

## (L) RELEVANT TAXING AUTHORITIES

Alabama Department of Labor

Alabama Department of Revenue

Arizona Dept. of Revenue

Arkansas Department of Finance and Administration

Arkansas Department of Workforce Services

California State Board of Equalization

Carroll County Trustee

Collector of Taxes, Jamaica

Corporation Income Tax, State of Arkansas

Delaware Division of Revenue

Department of Finance & Administration, State of Arkansas

Department of the Treasury

Florida Department of Economic Opportunity

Florida Department of Revenue

Georgia Department of Revenue

Illinois Department of Employment Security

Illinois Department of Revenue

Indiana Dept. of Revenue

Inland Department of Revenue of St. Lucia

Internal Revenue Service Headquarters Building

Iowa Dept. of Revenue

Jackson County, Dianne Burgess Collector

Kansas Dept. of Revenue

Kentucky Department of Revenue

Louisiana Department of Revenue

Massachusetts Dept. of Revenue

Missouri Department of Revenue

Missouri Department of Labor

N.C. Department of Revenue

Nebraska Dept. of Revenue

New Jersey Department of Labor and Workforce Development

New Jersey Division of Taxation

New Madrid County Collector - Dewayne Nowlin

New York State Dept. of Taxation and Finance

5

North Carolina Department of Revenue

NYS Corporation Tax

Pennsylvania Department of Revenue

Pennsylvania Dept. of Labor and Industry

Rowan County Tax Collector

South Carolina Department of Revenue

St. James Parish Property Taxes

St. John Parish Property Taxes

State of Louisiana Unemployment Office

State of New Jersey

State of New Mexico

State of Tennessee

State of Tennessee Unemployment Office

State of Texas Unemployment Office

Tax Administration Jamaica, King Street Revenue Centre

Tennessee Department of Revenue

Texas Comptroller of Public Accounts

Texas Department of Revenue

Town of Huntingdon

Washington Department of Revenue

Washington Employment Security Department

Williamson County, TN

Wisconsin Department of Revenue

### (M) Insurance Providers

ACE American Insurance Company

ACE Bermuda Insurance

ACE Property & Casualty Insurance Company

ACE Property & Casualty Insurance Company

AIG Europe Limited

American Guarantee & Liability Ins.

American International Reinsurance Co.

Aspen Insurance- United Kingdom

Axis Insurance Company

Berkley Insurance Co.

Commerce and Industry Insurance Company

Endurance Risk Solutions ASS

Factory Mutual Insurance Co.

Freedom Specialty Insurance Co.

Hanseatic Insurance Co.

Illinois National Insurance Co.

Insurance Co. of State of PA

Liberty Mutual Fire Ins. Co.

Liberty Surplus Ins. Corp.

Lloyds of London

National Union Fire Insurance Co. of Pittsburgh, PA

Navigators Insurance Company

New Hampshire Insurance Company

North American Specialty Insurance Company

Ohio Casualty Insurance Co

Scor UK Company

Starr Indemnity & Liability Company

Steadfast Insurance Company

Swiss Re International

Twin City Fire Insurance Co.

Xl Insurance America, Inc.

Zurich

### (N) LANDLORDS

Five Corporate Centre Acquisition Company

Max Trans

SH Bell Company

6

## (O) LITIGATION COUNTERPARTIES

Asbestos Corporation, Limited

Cape Fox Corporation

Caterpillar, Inc.

CBS Corporation, f/k/a Viacom, Inc., merger to CBS Corporation, f/k/a Westinghouse Electric Corp.

Certain-Teed Corporation

Continental Teves, Inc.

Crown, Cork and Seal Company, Inc.

CSR, Ltd., a/k/a Consolidated Sugar and Refining

Donjon Marine Co. Inc.

General Electric Company

General Gasket Corporation

Georgia-Pacific, LLC

Goodison Mining Limited

Government of Jamaica

Grinnell, LLC

Honeywell International, Inc.

J.P. Bushnell Packing Supply Co.

John Crane, Inc.

Kaiser Jamaica Bauxite Company

Louisiana Department of Environmental Quality (LDEQ)

Metropolitan Life Insurance Company

Navar, Inc.

Pnuemo Abex Corporation

Rachel Carlton

Riley Power, Inc. f/k/a Riley Stoker Corporation

The Dow Chemical Company

The J.R. Clarkson Company, successor to The Knuckle Valve Company and successor to J.E. Lonergan Company

Union Carbide Corporation

## (P) ORDINARY COURSE PROFESSIONALS

Burris, Thompson & Associates

Cambridge Advisory Group, Inc.

Cole Schotz, P.C.

Crowe Horwath LLP

Davis Polk

Fay, Nelson & Fay, LLC

FDH Consulting, LLC

FDH Resources, LLC

Frost Brown Todd, LLC

Greystone Capital Partners

Henry W. Fayne

Jackson Lewis LLP

Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, LLP

Lattimore, Black, Morgan, & Cain, PC

Matthews & Zahara, P.C.

McHaney & Associates, Inc.

Morgan, Lewis & Bockius, LLP

O'Melveny & Myers LLP

Osburn, Hine, Yates & Murphy, LLC

PerformPlus Consulting, LLC

Polsinelli PC

Porter Hedges LLP

Robinson & Lawing, LLP

Saiber LLC

Sedgwick Law

Semler Brossy Consulting Group, LLC

Steven Plotkin

Thompson Hine, LLC

Towers Watson Delaware, Inc.

Vaco, LLC

Wachtell, Lipton, Rosen & Katz

Windrow Phillips Group

## (Q) NON-LENDER SECURED PARTIES

A & B Transport, Inc.

AEP River Operations LLC

American River Transportation

Ameridrivers International

Anytime Hotshot & Delivery

AOA Services, Inc.

Artco

Averitt Express, Inc.

AWC, Inc.

Boland Marine & Manufacturing Company

Buchheit Trucking Service, Inc.

CDW Direct, LLC

Celtic Marine Corporation

CN

Con-Way

CRH Transportation

CSX Transportation

Cummings-Moore Graphite Co.

Dayton Freight Lines Inc.

DHL Express

Direct Freight Corporation

DMI Contractors, Inc.

DNOW L.P. (Wilson Mill, Tool)

Eagle Ship Supply, Inc.

Em-Cal Inc.

Estes Express Lines

Faith Global Transportation, LLC

Farmers Oil Corp.

Federal Express

Four Star Fabricators Inc.

FTI Logistics

GE Canada

General Electric Canada

Geodis Wilson USA, Inc.

Gulf Inland Marine Services, Inc.

Hapag Lloyd (America) Inc.

Hot Shot Freight

Hull Trucking

Ingram Barge Company

K.S. & D., Inc.

Kansas City Southern Railway

Livingston International

LME, Inc.

Lock City Trucking, Inc.

Lufkin Southeastern Gear Repair

M & S Specialized LLC

Marisol International LLC

Max Trans L.L.C.

Mid-Ship Group LLC

Mid-Ship Logistics Group

Motion Industries, Inc.

Neo Industries Inc. (05)

Nola Logistics Services, LLC

Nova Hydraulics

Oakley Trucking, Inc.

Old Dominion Freight Line

Paincourtville Motor Service, Inc.

Penzel Construction Company

Ports America, Inc.

Primetals Technologies USA,LLC

Quality Carriers, Inc.

R&L Carriers, Inc.

Radiatronics NDT, Inc.

Remedial Construction Services L.P.

Ryder Capital, S.A. de C.V.

Saia Motor Freight Line, Inc.

Satterfields

Scepter, Inc.

Schwerman Trucking Co.

Scott Financial Services, LLC

SH Bell Company

Shultz Steel Company

SNT Trucking & Warehousing

Southeastern Freight Lines

St Jude Harbor New Madrid Harbor Serv.

St. James Stevedoring Partners, LLC

St. John Fleeting, LLC

St. Jude & New Madrid Harbor Service, Inc.

Superior Carriers, Inc.

TBS Logistics Mo

Tennessee Aluminum Processors, Inc.

The CIT Group/Capital Finance, Inc.

Transwood Logistics, Inc.

Union Pacific Railway

United Parcel Service

United Power Services

USF Holland

Xtek, Inc.

Youngstown Hard Chrome

YRC

Ziegler

## (R) SIGNIFICANT COMPETITORS

Alcoa

Aleris

Alexin LLC

Alpha Aluminum Products Inc.

Century Aluminum

Glencore

JW Aluminum

Matalco

Norsk Hydro

Novelis

Rio Tinto Alcan

Sherwin

Southwire

Sural

## (S) SIGNIFICANT SHAREHOLDERS

Hotchkis & Wiley Capital Management

Royce and Associates Inc.

## (T) 30 LARGEST UNSECURED CREDITORS

American River Transportation

Aramark

Artisan Contracting, LLC

Associated Terminals, LLC

Boh Brothers Construction Co., L.L.C.

Carmeuse Lime Sales Corporation

DMI Contractors, Inc.

Donjon Marine Co. Inc.

EIU, Inc.

Goodison Mining Limited

HDR Inc.

Koppers Industries, Inc.

Kostmayer Construction, LLC

Max Trans L.L.C.

Mechatherm

Mexichem Fluor Comercial, S.A. de C.V.

Mid-Ship Group LLC

Motion Industries, Inc.

Nalco Company

Nissan Lift Trucks

Occidental Chemical Corporation

Petrocoque S.A.

Progressive Roofing

Rain CII Carbon, L.L.C.

Remedial Construction Services L.P.

Sherwin Alumina Co., LLC

Steward Steel

U.S. Bank National Association

University and Allied Workers Union

Vecta Environmental Services, LLC

### (U) U.S. TRUSTEE

Barbara J. Dorsey

Cynthia E. Moore

Karen R. Wilson-Smith

Kathy Lickenbrock

Leonora S. Long

Margaret E. Slaughter

Martha M. Dahm

Paul Randolph

Sandra Herling

### (V) UNIONS

Bustamante Industrial Workers Union (BITU)

International Association of Machinists & Aerospace Workers

Union of Technical, Administrative and Supervisory Personnel (UTASP)

United Steelworkers of America

University and Allied Workers Union (UAWU)

### (W) UTILITY PROVIDERS

Air-Nu of Baton Rouge, L.L.C.

Alcoa Primary Metals

Allied Waste Services

Amerenue

Associated Electric Cooperative

AT&T

Atmos Energy Marketing, LLC

Austin Fire Systems LLC

Big River Telephone Co. LDD, Inc.

Carroll County Electric Dept.

Centerpoint Energy

Charter Communications Holding Co.

Chemical Waste Management Inc.

Cintas Fire Protection

City of Salisbury

Comcast

Continuum Retail Energy Services, LLC

Cox Communications Louisiana, LLC

Diaz Water Department

Downums Disposal Service

Duke Energy

Enable Gas Transmission, LLC

Entergy Services, Inc.

Lemons Landfill Corporation

Level 3 Communications, LLC

Liberty Utilities

Pemiscot-Dunklin Electric Cooperative

10

Piedmont Natural Gas Co.

Republic Services

Republic Waste Services of North Carolina, LLC

St. Jude Industrial Park Board

St. John the Baptist Parish Utilities

Texican Horizon Energy Marketing LLC

Town of Huntingdon

Twin Eagle Resource Management, LLC

Union Electric Company

Verizon Wireless

Waste Management of TN-Jackson

West TN Public Utilities Dist.

**(X) KEY VENDORS**

3M

A. Karchmer & Sons, LLC

A.W. Chesterton Company

Air Products & Chemicals, Inc.

Alcoa Primary Metals

Alcoa, Inc. North America Primary Division

Aluminpro, Inc.

Aluminum Rheinfelden GmbH

Aluminum Rheinfelden GmbH

American Chemical Technologies

American Iron & Metal

American River Transportation

AMG Aluminum North America, LLC

AOA Services, Inc.

Aramark

ARG International

Artisan Contracting, LLC

Associated Electric Cooperative

Associated Terminals, LLC

AT&T Mobility

Austin Fire Systems LLC

Autoneum

Avkem International LLC

Bank of America- HSA

Bawtry Carbon International Limited

Belisle Machine and Tool

Bigbites Limited

Bluequest Resources Overseas Ltd.

Boh Brothers Construction

Brubaker Associates, Inc.

Bryan Cave LLP

Buss AG

Calumet Lubricants Company

Calumet Penreco

Cape Electrical Supply Co.

Caraustar Ind., Inc.

Carlton-Bates Company

Carmeuse Lime Sales Corporation

Carrier Corporation

Carroll County Electric Dept.

CCMA, LLC

Centerpoint Energy

CMC Recycling

CMC-Cometals

Continuus Spa

Cornerstone Chemical Company

Crowe Horwath LLP

Cytec Industries, Inc.

Dark Horse Rail Service

Deep South Crane & Rigging, LLC

Dewayne Nowlin

DMI Contractors, Inc.

DNOW L.P. (Wilson PVF)

Duke Energy

Ecovery, LLC

Electroless Nickel Plating

Electroless Nickel Plating of LA

Entergy

ERB Industrial Equipment

Fleetwood-Signode

Four Star Fabricators Inc.

Frost Brown Todd, LLC

GE Canada

General Cable de Mexico

General Electric Canada

Gexpro

GHD Engineering Group Inc.

Glencore Commodities

Glencore, Ltd.

Gregory Construction

GSM Sales Formerly Globe

GT Commodities

Gulf Inland Marine Services, Inc.

Harbison Walker Refractories

HDR Inc.

Henry A. Petter Supply Co.

Hertwich Engineering GmbH

Hoesch Metallurgie GmbH

Houghton International, Inc. (D.A. Stuart Company)

Hunter Equipment Co., Inc.

Huntington Plating Inc.

Ideal Chemical & Supply Co.

Imrie-Gielow Inc.

Industrial Chemicals Inc.

Intelex

J. Aron & Company

J.R. Hoe & Sons, Inc.

JBM Inc.

Jiaozuo Fluochem Industry Co. Ltd

K.S. & D., Inc.

Kansas City Southern Railway

KBM Affilips B.V.

Koppers Industries, Inc.

Kostmayer Construction, LLC

KT Grant, Inc.

Leeds Specialty Alloys, LLC

Legacy Equipment

Lemons Landfill Corporation

Liberty Utilities

Linde, Inc.

Lindsay Hamling

Louisiana Department of Revenue Sales

Lynn Whitsett Corporation

M & S Specialized LLC

Madison Electric Service Inc.

Manpower

Mars Machine and Repair Services

Max Trans L.L.C.

Mechatherm International Ltd.

Merichem Chemicals & Refinery Services

Metal Exchange Corporation

Metalloid Corporation

Metaullics Systems / Pyrotek

Mexichem Fluor Comercial, S.A. de C.V.

MFA Oil Company

MH Equipment

Mid-Ship Group LLC

Motion Industries, Inc.

Neuenhauser Maschinenbau GmbH

New Age Industrial Corp. Inc.

Nissan Lift Trucks

Noble Americas Corp.

Noble Resources

Nola Logistics Services, LLC

Oakley Trucking, Inc.

Occidental Chemical Corporation

Onedo Nalco Company - Dallas

Oxbow Calcining LLC

Paincourtville Motor Service, Inc.

Parman Energy Corporation

Pemiscot-Dunklin Electric Cooperative

Penzel Construction Company

Petrocoque S.A.

Phelps Dodge International

Pipe Link of Australia

Primetals Technologies USA, LLC

Pyrotek, Inc.  (02)

Pyrotek,Inc./Neco Division  (04)

Quality Machine Manufacturing, Inc.

R.J. Tricon Co., LLC

Rain CII Carbon, L.L.C.

Red Stick Armature Works, Inc.

Reintjes Services, Inc.

Remedial Construction Services L.P.

Resource Tek, LLC

Rheinfelden Alloys

Rheinfelden Alloys GmbH and Co. KG

Riotinto Alcan Inc.

River Parish Contractors, Inc.

RTW Refractory Inc.

Ruetgers Canada Inc.

RWH Myers

Ryder Capital

S & W Pallet Company

Safety-Kleen Systems Inc.

Scepter, Inc.

Service Aluminum Corporation

SGL Carbon GmbH

SH Bell Company

Shultz Steel Company

Siemens Industry, Inc.

Simcoa Operations Pty. Ltd.

Sims Metal Management

Southwest Electric Co.

St. Jude Harbor New Madrid Harbor Serv.

St. Jude Industrial Park Board

Steven Plotkin

Steward Steel

TDC, LLC

Tennessee Aluminum Processors, Inc.

Tennessee Valley Recycling, LLC

Texican Horizon Energy Marketing LLC

The Reynolds Company

Trafigura Trading LLC

Transwood Logistics, Inc.

Turner Specialty Services, LLC

Twin Eagle Resource Management, LLC

U.S. Maritime Services Inc.

Vaco, LLC

Valicor Separation Technologies, LLC

Valley West Welding Co. Inc.

Vecta Environmental Services, LLC

Watson Standard Adhesives

13

Web Converting, Inc.

Whelan Security Co.

Worley Parsons HE

Xtek, Inc.

Ziegler

## **EXHIBIT C**

## **ENGAGEMENT LETTER**

PJT Partners

PJT

January 25, 2016

Alan W. Kornberg
Partner
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Dear Mr. Kornberg:

This letter (the "**Agreement**") amends and restates that certain letter agreement dated as of November 6, 2015 (the "**Prior Letter**") between PJT Partners LP ("**PJT Partners**") and Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Counsel**"). This letter confirms that since November 6, 2015 (the "**Effective Date**"), PJT Partners has been retained by Counsel in relation to Counsel's representation of Noranda Aluminum Holding Corp. (together with any affiliates and subsidiaries, the "**Company**") to provide certain investment banking services.

Under this Agreement, PJT Partners will provide investment banking services to the Company in connection with a possible restructuring of certain liabilities of the Company and any transaction or series of transactions involving the sale, merger or other disposition of all or a portion of the Company, any business of the Company or any material asset of the Company whether pursuant to a section 363 sale, plan of reorganization or liquidation or otherwise (a "**Sale Transaction**") and will assist Counsel in its representation of the Company in analyzing, structuring, negotiating and effecting the Restructuring pursuant to the terms and conditions of this Agreement. As used in this Agreement, the term "**Restructuring**" shall mean, collectively, (i) any restructuring, reorganization (whether or not pursuant to chapter 11 of the United States Bankruptcy Code ("**Chapter 11**")) and/or recapitalization of the Company materially affecting existing or potential debt obligations or other claims, including, without limitation, senior debt, junior debt, trade claims, general unsecured claims and preferred stock (collectively, the "**Obligations**"), and/or (ii) any complete or partial repurchase, refinancing, extension or repayment by the Company of any of the Obligations other than repurchases, refinancings or exchanges of the Obligations that are, individually and in the aggregate, de minimis.

The investment banking services to be rendered by PJT Partners may include the following:

      (a)      assist in the evaluation of the Company's businesses and prospects;

(b)   assist in the development of the Company's long-term business plan and related financial projections;

(c)   assist in the development of financial data and presentations to the Company's Board of Directors, various creditors and other third parties;

(d)   analyze the Company's financial liquidity and evaluate alternatives to improve such liquidity;

(e)   analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of those stakeholders impacted by the Restructuring;

(f)   provide strategic advice with regard to restructuring or refinancing the Company's Obligations;

(g)   evaluate the Company's debt capacity and alternative capital structures;

(h)   participate in negotiations among the Company and its creditors, suppliers, lessors, employee representatives and other interested parties;

(i)   value securities offered by the Company in connection with a Restructuring;

(j)   advise the Company and negotiate with lenders with respect to potential waivers or amendments of various credit facilities;

(k)   assist in arranging financing for the Company, as requested;

(l)   provide expert witness testimony concerning any of the subjects encompassed by the other investment banking services;

(m)   assist the Company in preparing marketing materials in conjunction with a possible Sale Transaction;

(n)   assist the Company in identifying potential buyers or parties in interest to a Sale Transaction and assist in the due diligence process;

(o)   assist and advise the Company concerning the terms, conditions and impact of any proposed Sale Transaction; and

(p)   provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring or Sale Transaction, as requested and mutually agreed.

Notwithstanding anything contained in this Agreement to the contrary, PJT Partners shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity. PJT Partners makes no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Restructuring. PJT Partners is retained under this Agreement solely to provide advice regarding a Restructuring or a Sale Transaction, and is not being retained to provide "crisis management" or any legal, tax, accounting or actuarial advice. It is understood and agreed that nothing contained herein shall constitute a commitment, express or implied, on the part of PJT Partners to underwrite, purchase or place any securities, in a financing or otherwise.

It is agreed that the Company will pay the following fees to PJT Partners for its investment banking services (all fees and expenses payable to PJT Partners pursuant to this Agreement shall be payable solely by the Company; Counsel shall have no obligation to pay PJT Partners' fees or expenses):

(i) **Monthly Fee**: During the term of this Agreement, a monthly advisory fee (the "**Monthly Fee**") in the amount of $175,000, per month, in cash, with the first Monthly Fee payable upon the Effective Date and additional installments of such Monthly Fee payable in advance on each monthly anniversary of the Effective Date.

(ii) **Capital Raising Fee**: A capital raising fee (the "**Capital Raising Fee**") for any financing arranged by PJT Partners, at the Company's request, earned and payable upon the closing of such financing. If access to the financing is limited by orders of the bankruptcy court, a proportionate fee shall be payable with respect to each available commitment (irrespective of availability blocks, borrowing base, or other similar restrictions). For the avoidance of doubt, no Capital Raising Fee shall be payable with respect to the Company's use of its lenders' cash collateral during a chapter 11 case. The Capital Raising Fee will be calculated as 1.0% of the total issuance size for any debtor-in-possession financing raised pursuant to chapter 11 court process, 1.0% of the total issuance size for senior debt, 2.0% of the total issuance size for junior debt financing, and 4.5% of the issuance amount for equity financing; provided, however, that (a) PJT Partners will credit 50% of any Capital Raising Fee against the applicable Restructuring Fee or Sale Transaction Fee and (b) PJT Partners will agree to reduce its Capital Raising Fee by 50% for any financing or capital raised from (x) the parties listed on Schedule I or (y) any then current equity holders, lenders, debt holders, other security holders, or creditors of the Company or any subsidiary of the Company or any of their respective affiliates, subsidiaries or affiliated funds.

(iii) **Sale Transaction Fees**. Upon the consummation of a Sale Transaction, a Sale Transaction fee ("**Sale Transaction Fee**") payable in cash at the closing of such Sale Transaction directly out of the gross proceeds of the Sale Transaction or other available funds calculated as 1.25% of the Consideration. The parties hereto acknowledge and agree that: (i) PJT Partners shall be paid a Sale Transaction Fee with respect to each Sale Transaction consummated by the Company, (ii) to the extent paid, all Sale Transaction Fees shall be credited against any Restructuring Fee payable to PJT Partners and (iii) in no circumstances shall the total amount of the Sale Transaction Fee(s) and Restructuring Fee payable to PJT Partners pursuant to this Agreement (excluding expenses) exceed $5,000,000.

In this Agreement, "**Consideration**" means the gross value of all cash, securities and other properties paid or payable, directly or indirectly, in one transaction or in a series or combination of transactions, in connection with the Sale Transaction or a transaction related thereto (including, without limitation, amounts paid (A) pursuant to covenants not to compete or similar arrangements and (B) to holders of any warrants, stock purchase rights, convertible securities or similar rights and to holders of any options or stock appreciation rights, whether or not vested).

Consideration shall also include (i) (I) in the case of the sale, exchange or purchase of the Company's equity securities the principal amount of any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities as set forth on the most recent consolidated balance sheet of the Company prior to the consummation of such sale, exchange or purchase or (II) in the case of a sale or disposition of assets by the Company the principal amount of any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities indirectly or directly assumed or acquired, and (ii) any indebtedness for borrowed money, preferred stock obligations, any pension liabilities, capital leases, guarantees and any other long-term liabilities that are or otherwise repaid or retired, in connection with or in anticipation of the Sale Transaction. Consideration shall also include the aggregate amount of any extraordinary dividend or distribution made by the Company from the date hereof until the Closing of the Sale Transaction. Consideration shall include all amounts paid into escrow and all contingent payments payable in connection with the Sale Transaction, with fees on amounts paid into escrow to be payable upon the establishment of such escrow and fees on contingent payments to be payable when such contingent payments are made.  If the Consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such Consideration is paid.

In this Agreement, the value of any securities (whether debt or equity) or other property paid or payable as part of the Consideration shall be determined as follows: (1) the value of securities that are freely tradable in an established public market will be determined on the basis of the last market closing price prior to the public announcement of the Sale Transaction; (2) the value of securities that are not freely tradable or have no established public market or, if the Consideration utilized consists of property other than securities, the value of such other property shall be the fair market value thereof as mutually agreed by the parties hereto; and (3) the value of any credit bid by any current lender or other holder of debt of the Company shall be equal to the face amount of such credit or debt.

(iv)    **Restructuring Fees**:  Upon the consummation of a Restructuring, an additional fee (the "**Restructuring Fee**") equal to $5,000,000.  As used in this Agreement, a Restructuring shall be deemed to have been consummated upon the earlier of (a) the execution, confirmation and consummation of a plan of reorganization pursuant to an order of the Bankruptcy Court or (b) the transfer of the Company's assets remaining after consummating at least one Sale Transaction into a liquidating trust or similar vehicle through which the Company's remaining assets are to be sold or liquidated pursuant to a Bankruptcy Court order approving same. The parties hereto acknowledge and agree that:  (I) to the extent paid, any Restructuring Fee payable to PJT Partners pursuant to this subsection (iv) shall be reduced by any Sale Transaction Fees previously paid to PJT Partners and (II) in no circumstances shall the total amount of Sale Transaction Fee(s) and

Restructuring Fee payable to PJT Partners pursuant to this Agreement (excluding expenses) exceed $5,000,000.

(v)      Reimbursement of all reasonable out-of-pocket expenses incurred during this engagement, including, but not limited to, travel and lodging, direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals, reasonable fees and expenses of PJT Partners' counsel and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses. In connection therewith the Company shall pay PJT Partners on the Effective Date and maintain thereafter a $25,000 expense advance for which PJT Partners shall account upon termination of this Agreement.

In the event that the Company is or becomes a debtor under chapter 11 of the Bankruptcy Code, the Company shall use its best efforts to promptly apply to the bankruptcy court having jurisdiction over the chapter 11 case or cases (the "**Bankruptcy Court**") for the approval pursuant to sections 327 and 328 of the Bankruptcy Code of (A) this Agreement, including the attached indemnification agreement, and (B) PJT Partners' retention by the Company under the terms of this Agreement and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to any other standard of review, including section 330 of the Bankruptcy Code. The Company shall supply PJT Partners with a draft of such application and any proposed order authorizing PJT Partners' retention sufficiently in advance of the filing of such application and proposed order to enable PJT Partners and its counsel to review and reasonably comment thereon. PJT Partners shall have no obligation to provide any services under this Agreement in the event that the Company becomes a debtor under chapter 11 unless PJT Partners' retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to PJT Partners in all respects. PJT Partners acknowledges that in the event that the Bankruptcy Court approves its retention by the Company, PJT Partners' fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code and any applicable fee and expense guideline orders; provided, however, that PJT Partners shall not be required to maintain time records, except as otherwise ordered by the Bankruptcy Court, and, provided further, that PJT Partners shall not be required to maintain receipts for expenses in amounts less than $75. In the event that the Company becomes a debtor under Chapter 11 and PJT Partners' engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of PJT Partners hereunder as promptly as practicable in accordance with the terms hereof. Prior to commencing a Chapter 11 case, the Company shall pay all invoiced amounts to PJT Partners in immediately available funds by wire transfer.

With respect to PJT Partners' retention under sections 327 and 328 of Chapter 11, the Company acknowledges and agrees that PJT Partners' restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of PJT Partners' engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of PJT Partners' services hereunder could not be measured merely by reference to the number of hours to be expended by PJT Partners' professionals in the

performance of such services.  The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of PJT Partners and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for PJT Partners and that the actual time and commitment required of PJT Partners and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm.  In addition, given the numerous issues which PJT Partners may be required to address in the performance of its services hereunder, PJT Partners' commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for PJT Partners' services for engagements of this nature in an out-of-court context, the Company agrees that the fee arrangements hereunder (including the Monthly Fee, Capital Raising Fee, Restructuring Fee and Sale Transaction Fee) are reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

The advisory services and compensation arrangement set forth in this Agreement do not encompass other investment banking services or transactions that may be undertaken by PJT Partners at the request of Counsel or the Company, including the arranging of debt or equity capital (except as provided above), providing mergers and acquisitions advice (except for a Restructuring involving a merger or sale or other disposition of substantially all of the Company's assets), issuing fairness opinions or any other specific services not set forth in this Agreement.   The terms and conditions of any such investment banking services, including compensation arrangements, will be negotiated in good faith by the Company and PJT Partners at the time such services are requested and will be set forth in a separate written agreement between PJT Partners and the appropriate party.

Except as contemplated by the terms hereof or as required by applicable law, regulation or legal process, for a period of eighteen months from the date hereof, PJT Partners shall keep confidential all material non-public information provided to it by or at the request of the Company, and shall not disclose such information to any third party or to any of its employees or advisors except to those persons who have a need to know such information in connection with PJT Partners' performance of its responsibilities hereunder and who are advised of the confidential nature of the information and who agree to keep such information confidential.

In the event PJT Partners or any of its representatives becomes obligated by applicable law or legal process, or is requested by a governmental or stock exchange authority (including any subpoena, discovery or information  request or judicial or governmental order), to disclose any such material non-public information, (a) PJT Partners shall, to the extent practicable and legally permissible, promptly provide the Company with written notice thereof so as to permit the Company to seek a protective order or other appropriate remedy, and shall reasonably cooperate with the Company in the Company's efforts in connection therewith, and (b) PJT Partners or its representative shall be permitted to disclose only that portion of such information that is legally required to be disclosed or is required to be disclosed in connection with a request by a governmental or stock exchange authority, and PJT Partners shall exercise reasonable efforts to obtain reliable assurances that all such information will be accorded confidential treatment. Notwithstanding the foregoing, notice to the Company shall not be required where disclosure is made in response to a request by a regulatory or self-regulatory authority or in connection with a routine audit or examination by a bank examiner or auditor and such audit or examination does

not reference the Company or this Agreement.  PJT Partners acknowledges that the value of any such information to the Company is unique and substantial, but may be impractical or difficult to assess in monetary terms. In the event of an actual or threatened violation of the confidentiality provisions of this Agreement, PJT Partners expressly consents to the enforcement of such provisions by the Company seeking injunctive relief or specific performance, without proof of actual damages or any requirement to post a bond, in addition to any and all other remedies available to the Company.

The Company and/or Counsel will furnish or cause to be furnished to PJT Partners such information as PJT Partners believes appropriate to its assignment (all such information so furnished being the "**Information**").  The Company further agrees that it will provide PJT Partners with reasonable access to the Company and its directors, officers, employees and advisers. The Company shall inform PJT Partners promptly upon becoming aware of any material developments relating to the Company which the Company reasonably expects may impact the assignment or if the Company becomes aware that any Information provided to PJT Partners is, or has become, untrue, unfair, inaccurate or misleading in any way.  Furthermore, the Company warrants and undertakes to PJT Partners in respect of all Information supplied by the Company that the Company has not obtained any such Information other than by lawful means and that disclosure to PJT Partners will not breach any agreement or duty of confidentiality owed to third parties.  The Company recognizes and confirms that PJT Partners (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, (c) is entitled to rely upon the Information without independent verification, and (d) will not make an appraisal of any assets in connection with its assignment.  Upon termination of this Agreement, or at any other time upon the reasonable request of the Company, PJT Partners shall promptly return to the Company or, at PJT Partner's election, destroy promptly all Information, together with all copies and other reproductions thereof wherever located, and any oral Information or Information acquired by visual inspection (and any Information not otherwise returned to the Company or destroyed for any reason) shall continue to be subject to the terms of this Agreement.  Notwithstanding the return, destruction or archiving of Information pursuant to this Agreement, PJT Partners shall continue to be subject to the confidentiality provisions under this Agreement.  Notwithstanding anything to the contrary in this paragraph, PJT Partners may retain Information in order to comply with applicable law or regulation or its internal policy requirements.

In the event that the Information belonging to the Company is stored electronically on PJT Partners' computer systems, PJT Partners shall not be liable for any damages resulting from unauthorized access, misuse or alteration of such information by persons not acting on its behalf, provided that PJT Partners exercises the same degree of care in protecting the confidentiality of, and in preventing unauthorized access to, the Company's information that it exercises with regard to its own most sensitive proprietary information.

PJT Partners acknowledges and agrees that the work product produced by PJT Partners pursuant to this Agreement is for the purpose of facilitating the rendering by Counsel of legal advice to the Company and constitutes attorney work product, and that any communication to Counsel, including, without limitation, any correspondence, analyses, reports and related materials that

PJT Partners prepares, constitutes confidential and privileged communications and PJT Partners will not disclose the same or any of the Information to any other person except as requested by Counsel.

Except as required by applicable law, any advice to be provided by PJT Partners under this Agreement shall not be disclosed publicly or made available to third parties (other than the Company's other professional advisors or, if appropriate in the Company's judgment, in any filings in a Chapter 11 proceeding) without the prior written consent of PJT Partners, which consent shall not be unreasonably withheld. All services, advice and information and reports provided by PJT Partners to the Company or Counsel in connection with this assignment shall be for the sole benefit of the Company or Counsel and shall not be relied upon by any other person.

The Company acknowledges and agrees that PJT Partners will provide its investment banking services exclusively to the members of the Board of Directors and senior management of the Company and not to the Company's shareholders or other constituencies. The Board of Directors and senior management will make all decisions for the Company regarding whether and how the Company will pursue a Restructuring or Sale Transaction and on what terms and by what process. In so doing, the Board of Directors and senior management will also obtain the advice of the Company's legal, tax and other business advisors and consider such other factors which they consider appropriate before exercising their independent business judgment in respect of a Restructuring or Sale Transaction. The Company further acknowledges and agrees that PJT Partners has been retained to act solely as investment banker to the Company and does not in such capacity act as a fiduciary for the Company or any other person. PJT Partners shall act as an independent contractor and any duties of PJT Partners arising out of its engagement pursuant to this Agreement shall be owed solely to the Company.

In consideration of PJT Partners' agreement to provide investment banking in connection with this Agreement, it is agreed that the Company will indemnify PJT Partners and its agents, representatives, members and employees. A copy of our standard form of indemnification agreement is attached to this Agreement as Attachment A. PJT Partners acknowledges Counsel is not providing an indemnity or any other similar type of undertaking to PJT Partners or otherwise for PJT Partners' benefit in connection with this Agreement.

PJT Partners' engagement hereunder may be terminated upon 30 days' written notice without cause by the Company, Counsel, or PJT Partners; termination for cause by any party will occur forthwith. Notwithstanding the foregoing, (a) the provisions relating to the payment of fees and expenses accrued through the date of termination, the status of PJT Partners as an independent contractor and the limitation as to whom PJT Partners shall owe any duties will survive any such termination, (b) any such termination shall not affect the Company's obligations under the indemnification agreement attached as Attachment A or PJT Partners' confidentiality obligations hereunder and (c) PJT Partners shall be entitled to the Restructuring Fee or Sale Transaction Fee, as applicable, in the event that at any time prior to the expiration of 12 months following the termination of this Agreement a definitive agreement with respect to a Restructuring or Sale Transaction, as applicable, is executed and a Restructuring or Sale Transaction is thereafter consummated; provided, however, in the event that PJT Partners terminates its engagement without cause or is terminated for cause, PJT Partners will not be entitled to the Restructuring

Fee. For the purpose of this paragraph, "cause" shall mean gross negligence, fraud, willful misconduct, bad faith or a material and uncured breach of this Agreement by PJT Partners.

The Company represents that neither it nor any of its affiliates under common control, nor, to the knowledge of the Company, any of their respective directors or officers, is an individual or entity ("**Person**") that is, or is owned or controlled by a Person that is: (i) a Person with whom dealings are restricted or prohibited under U.S. economic sanctions (including those administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control) or similar sanctions imposed by another relevant sanctions authority (collectively, "**Sanctions**"); or (ii) to the knowledge of the Company, not in compliance in all material respects with all applicable anti-money laundering laws and Sanctions.

The Company should be aware that PJT Partners and/or its affiliates may be providing or may in the future provide financial or other services to other parties with conflicting interests. Consistent with PJT Partners' policy to hold in confidence the affairs of its clients, PJT Partners will not use confidential information obtained from the Company except in connection with PJT Partners' services to, and PJT Partners' relationship with, the Company, nor will PJT Partners use on the Company's behalf any confidential information obtained from any other client. Notwithstanding anything to the contrary provided elsewhere herein, the Company expressly acknowledges and agrees that none of the provisions of this Agreement shall in away restrict PJT Partners from being engaged or mandated by any third party, or otherwise participating or assisting with any transaction involving any other party.

The parties hereto acknowledge and agree that the Prior Letter terminate as of the date hereof and have no further force and effect. Notwithstanding the foregoing, (a) the provisions relating to the payment of fees and expenses earned and accrued through the date of termination, the status of PJT Partners as an independent contractor and the limitation as to whom PJT Partners shall owe any duties will survive any such termination, and (b) any such termination shall not affect the Company's obligations pursuant to the indemnification agreement entered into in connection with the Prior Letter.

This Agreement (including the attached indemnification agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect or impair such provision or the remaining provisions of this Agreement in any other respect, which will remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state.

The Company and Counsel hereby agree that any action or proceeding brought by the Company or Counsel against PJT Partners based hereon or arising out of PJT Partners' engagement hereunder, shall be brought and maintained by the Company or Counsel exclusively in the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York; provided, if the Company commences a Chapter 11 case, all legal proceedings pertaining to this engagement arising after such case is commenced may be brought in the Bankruptcy Court handling such case. The Company and Counsel irrevocably submit to the jurisdiction of the courts of the State of New York located in

the City and County of New York and the United States District Court for the Southern District of New York and appellate courts from any thereof for the purpose of any action or proceeding based hereon or arising out of PJT Partners' engagement hereunder and irrevocably agrees to be bound by any judgment rendered thereby in connection with such action or proceedings.  The Company and Counsel hereby irrevocably waive, to the fullest extent permitted by law, any objection it may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agrees not to plead or claim the same.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to PJT Partners the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A.

Very truly yours,

PJT PARTNERS LP

By: PJT Management, LLC, its general partner

By: _____

Name: Mark Buschmann
Title:  Partner

Accepted and Agreed to as
of the date first written above:

NORANDA ALUMINUM HOLDING CORP.

By: _____

Name:
Title:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

Name: Alan W. Kornberg
Title:   Partner

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to PJT Partners the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A.

Very truly yours,

PJT PARTNERS LP

By: PJT Management, LLC, its general partner

By: _____
     Name: Mark Buschmann
     Title:  Partner

Accepted and Agreed to as
of the date first written above:

NORANDA ALUMINUM HOLDING CORP.

By: _____
     Name:  Dale W. Boyles
     Title:  Chief Financial Officer

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
     Name: Alan W. Kornberg
     Title:  Partner

SCHEDULE I

1. Black Diamond
2. Gores Group
3. KPS Capital
4. Platinum Equity
5. Pamplona Capital Management
6. Da Da Holdings
7. Wynnchurch Capital, Ltd.

ATTACHMENT A

January , 2016

PJT Partners LP
280 Park Avenue
New York, NY  10017

INDEMNIFICATION AGREEMENT

Ladies and Gentlemen:

This letter will confirm that our counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Counsel**") has engaged PJT Partners LP ("**PJT Partners**") to advise and assist in connection with the matters referred to in your letter of agreement dated as of January 25, 2016 (the "**Engagement Letter**").  In consideration of your agreement to act on our and our counsel's behalf in connection with such matters, we agree to indemnify and hold harmless you and your affiliates and your and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling you or any of your affiliates (you and each such other person being an "**Indemnified Party**") from and against any losses, claims, damages, expenses and liabilities whatsoever, whether they be joint or several, related to, arising out of or in connection with the engagement  under the Engagement Letter, including without limitation, any related services and activities prior to the date of the Engagement Letter (the "**Engagement**") and will reimburse each Indemnified Party for all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, or otherwise responding to, or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement or this agreement, whether or not pending or threatened, whether or not any Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by us.  To the extent Counsel does not advise us otherwise due to a material prejudice or actual conflict of interest, we also agree to cooperate with PJT Partners and to give, and so far as it is able to procure the giving of, all such information and render all such assistance to PJT Partners as PJT Partners may reasonably request in connection with any such action, claim, suit, proceeding, investigation or judgment and not to take any action which might reasonably be expected to prejudice the position of PJT Partners or its affiliates in relation to any such action, claim, suit, proceeding, investigation or judgment without the consent of PJT Partners (such consent not to be unreasonably withheld).  In the event that PJT Partners is requested or authorized by us or required by government regulation, subpoena or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, arising as a result of or in connection with the Engagement, we will, so long as PJT Partners is not a party to the proceeding in which the information is sought, pay PJT Partners the reasonable fees and expenses of its counsel incurred in responding to such a request. We will not, however, be liable under the foregoing indemnification provision for any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined

by a court of competent jurisdiction to have primarily resulted from the bad faith, gross negligence or willful misconduct of PJT Partners or an Indemnified Party. We also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to us or our owners, parents, affiliates, security holders or creditors for or in connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by us that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the bad faith, gross negligence or willful misconduct of PJT Partners or an Indemnified Party.

If the indemnification provided for in the preceding paragraph is for any reason (other than the bad faith, gross negligence or willful misconduct of PJT Partners or an Indemnified Person as provided above) unavailable to an Indemnified Party in respect of any losses, claims, damages or liabilities referred to herein, then, in lieu of indemnifying such Indemnified Party hereunder, we shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities (and expenses relating thereto) in such proportion as is appropriate to reflect not only the relative benefits received (or anticipated to be received) by you, on the one hand, and us, on the other hand, from the Engagement but also the relative fault of each of you and us, as well as any other relevant equitable considerations; provided, however, to the extent permitted by applicable law, in no event shall your aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by you under the Engagement Letter. For the purposes of this agreement, the relative benefits to us and you of the Engagement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by us, our security holders and our creditors in the transaction or transactions that are subject to the Engagement, whether or not any such transaction is consummated, bears to (b) the fees paid or to be paid to PJT Partners under the Engagement Letter (excluding any amounts paid as reimbursement of expenses).

Neither party to this agreement will, without the prior written consent of the other party (which consent will not be unreasonably withheld), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (a "**Judgment**"), whether or not we or any Indemnified Party are an actual or potential party to such claim, action, suit or proceeding. In the event that we seek to settle or compromise or consent to the entry of any Judgment, we agree that such settlement, compromise or consent (i) shall include an unconditional release of PJT Partners and each other Indemnified Party hereunder from all liability arising out of such claim, action, suit or proceeding, (ii) shall not include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of PJT Partners or each other Indemnified Party, and (iii) shall not impose any continuing obligations or restrictions on PJT Partners or each other Indemnified Party.

Promptly after receipt by an Indemnified Party of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify us in writing of such complaint or of the commencement of such action or proceeding, but failure to so notify us will not relieve us from any liability which we may have hereunder or otherwise, except to the extent that such failure materially prejudices our rights. If we so elect or are requested by such Indemnified Party, we will assume the defense of

such action or proceeding, including the employment of counsel reasonably satisfactory to PJT Partners and the payment of the fees and disbursements of such counsel.

In the event, however, such Indemnified Party reasonably determines in its judgment that having common counsel would present such counsel with a conflict of interest or if we fail to assume the defense of the action or proceeding in a timely manner, then such Indemnified Party may employ separate counsel reasonably satisfactory to us to represent or defend it in any such action or proceeding and we will pay the reasonable fees and disbursements of such counsel; provided, however, that we will not be required to pay the fees and disbursements of more than one separate counsel for all Indemnified Parties in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which we assume, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense.

The foregoing reimbursement, indemnity and contribution obligations of ours under this agreement shall be in addition to any rights that an Indemnified Party may have at common law or otherwise, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of ours and such Indemnified Party.  We agree that the indemnity and reimbursement obligations of ours set out herein shall be in addition to any liability which we may otherwise have under the Engagement Letter and applicable law and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of ours, PJT Partners and any such Indemnified Party.

The provisions of this agreement shall apply to the Engagement, as well as any additional engagement of PJT Partners by us in connection with the matters which are the subject of the Engagement, and any written modification of the Engagement or additional engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

This agreement and the Engagement Letter shall be governed by, and construed in accordance with the laws of the State of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,

NORANDA ALUMINUM HOLDING CORP.

By: _____

Name: Dale W. Boyles

Title: Chief Financial Officer

Accepted and Agreed to as
of the date first written above:

PJT PARTNERS LP

By: PJT Management, LLC, its general partner

By: _____

Name: Mark Buschmann
Title: Partner

The provisions of this agreement shall apply to the Engagement, as well as any additional engagement of PJT Partners by us in connection with the matters which are the subject of the Engagement, and any written modification of the Engagement or additional engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

This agreement and the Engagement Letter shall be governed by, and construed in accordance with the laws of the State of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,

NORANDA ALUMINUM HOLDING CORP.

By:

_____

Name:
Title:

Accepted and Agreed to as
of the date first written above:

PJT PARTNERS LP

By: PJT Management, LLC, its general partner

By: _____

Name: Mark Buschmann
Title: Partner